In Re:                                                      Case Number: 15-27703-RAM
                                                            Chapter 13

CLEMENCIA CHARLES,

      Debtor.

_____/

## OBJECTION TO CLAIM

### IMPORTANT NOTICE TO CREDITOR:
### THIS IS AN OBJECTION TO YOUR CLAIM

**This objection seeks either to disallow or reduce the amount or change the priority status of the claim filed by you or on your behalf. Please read this objection carefully to identify which claim is objected to and what disposition of your claim is recommended.**

**If you disagree with the objection or the recommended treatment, you must file a written response WITHIN 30 DAYS from the date of service of this objection, explaining why your claim should be allowed as presently filed, and you must serve a copy to the undersigned attorney OR YOUR CLAIM MAY BE DISPOSED OF IN ACCORDANCE WITH THE RECOMMENDATION IN THIS OBJECTION.**

**If your entire claim is objected to and this is a chapter 11 case, you will not have the right to vote to accept or reject any proposed plan of reorganization until the objection is resolved, unless you request an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing your claim for voting purposes.**

**The written response must contain the case name, case number, and must be filed with the Clerk of the United States Bankruptcy Court.**

Pursuant to Bankruptcy Rule 3007 and Local Rule 3007-1, the Debtor objects to the following claim filed in this case *:

| Claim No. | Name of Claimant | Amount of Claim | Basis for Objection and Recommended Disposition |
|---|---|---|---|
| 1 | Wealthy Delight, LLC | $3,620 | SEE BELOW. |

*Notwithstanding the requirements of Bankruptcy Rule 3007, up to five objections to claim may be included in one pleading. (See Local Rule 3007-1(C).)

**I.      Reasons for Objection**

    1.     Debtor is including an Appendix in support of her Objection to Claim, and will refer to them throughout the Objection to Claim as "A.Page Number." The documents in Debtor's Appendix are as follows:

        A.     Creditor's rent ledger as of October 9, 2015. A.1-2.

B.	Debtor's rent ledger as of November 25, 2015. A.3-6.

C.	Receipt No. 578500 from Creditor to Debtor dated December 27, 2011, for $440, and corresponding Money Order No. 10452880904 for the same. A.7-8.

D.	Receipt No. 308679 from Creditor to Debtor dated June 26, 2012, for $440, and corresponding Money Order No. 20044281925 for the same. A.9-10.

E.	Docket for *Wealthy Delight, LLC v. Clemencia Charles*, Miami-Dade County Court Case No. 2015-9952-CC-23 (02), showing a total of $1,760 that Debtor deposited into the State Court Registry. A.11-15.

F.	Receipt for the U.S. Bankruptcy Court dated October 6, 2015, for $440. A.16.

G.	Legal Services of Greater Miami, Inc. Trust Account Check No. 2359 for $61 and Check No. 2360 for $907, for a total of $968 (the Trustee's Fee of $88 plus two months of lot rent totaling $880). A.17-18.

H.	Deposition of Addys Dominguez in *Wealthy Delight, LLC v. Nelly Shirley*, Miami-Dade County Court Case No. 2015-10110-CC-23 (04), taken on October 21, 2015. A.19-112.

2.	In the eviction case that Creditor filed against Debtor, it claimed that she owed an outstanding amount of lot rent of $1,420. Creditor claimed this was for unpaid lot rent for the months of February, March, April, and May of 2015. A.5-6. However, Creditor's own rent ledger shows that Debtor paid, and Creditor accepted lot rent payments from Debtor for the months of February, March, April, and May of 2015. A.2.

3.	Creditor now claims that Debtor owes a balance of $3,620, which represents various months of lot rent from September 1, 2010, through and including October 9, 2015. A.1-2.

4.	Creditor's rent ledger is troubling. Creditor is missing numerous payments, and much of the information is wrong. A.1-2. In an effort to correct Creditor's accounting from September 1, 2010, to the present, Debtor prepared an accurate rent ledger. A.3-6.

5.	This is not the only instance of Creditor's bad accounting. In another case where Creditor filed an eviction against a different mobile home owner for alleged non-payment of lot rent, Addys Dominguez (the park manager and representative for Creditor) admitted in a deposition that there were problems with the accounting, including not properly giving credit for lot rent payments Creditor has accepted. A.66, 78.

6.	Here, in this case, Creditor is missing the following payments from its rent ledger for Debtor:

A.	Receipt No. 578500 from Creditor to Debtor dated December 27, 2011, for $440, and corresponding Money Order No. 10452880904 for the same. A.7-8. This payment was never credited to Debtor's account, despite Debtor having supporting documentation for the same.

B.	Receipt No. 308679 from Creditor to Debtor dated June 26, 2012, for $440, and corresponding Money Order No. 20044281925 for the same. A.9-10. This payment was never credited to Debtor's account. Creditor lists a "cash reversal" charge on its rent ledger, but does not have any supporting documentation. A.1.

C. Docket for *Wealthy Delight, LLC v. Clemencia Charles*, Miami-Dade County Court Case No. 2015-9952-CC-23 (02), showing a total of $1,760 that Debtor deposited into the State Court Registry. A.11-15. This information is not reflected on Creditor's rent ledger.

D. Receipt for the U.S. Bankruptcy Court dated October 6, 2015, for $440. A.16. Again, this information is not reflected on Creditor's rent ledger.

E. Legal Services of Greater Miami, Inc. Trust Account Check No. 2359 for $61 and Check No. 2360 for $907, for a total of $968 (the Trustee's Fee of $88 plus two months of lot rent totaling $880). A.17-18. While Creditor's rent ledger does not take into account November lot rent, Debtor's ledger does. A.2, 6. Her ledger also reflects these most recent payments forwarded to the Trustee under her proposed Chapter 13 Plan. A.6.

7. Debtor only owes Creditor $100 for lot rent. A.6.

## II. Recommended Disposition

8. Debtor proposes that the Court sustain Debtor's objection to the Proof of Claim filed by Wealthy Delight, LLC. In the alternative, the Court should require Wealthy Delight, LLC to amend its Proof of Claim in light of the Debtor's documentation and Wealthy Delight, LLC's poor recordkeeping. The Court should also award the Debtor her reasonable costs and attorneys' fees for bringing this Objection to Claim.

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2102.910(A).

Respectfully submitted,

LEGAL SERVICES OF GREATER MIAMI, INC.

By: */s/ Evian White*
Evian L. White, Esq.
Florida Bar No. 84790
Attorney for Debtor
3000 Biscayne Boulevard, Suite 500
Miami, Florida 33137
Telephone: (305) 438-2552
Facsimile: (305) 573-2773
E-mail: ewhite@legalservicesmiami.org
Secondary: sfreire@legalservicesmiami.org
Secondary: pleadings@legalservicesmiami.org

Resident Transaction Report
Wealthy Delight, LLC
Start Date 01/01/2010

08-3531
Wealthy Delight LLC
8500 Biscayne Blvd #A154
Miami FL 33138

KW Property Management & Cons.
8200 NW 33rd Street, Suite 300
Doral FL 33122

| Unit | Space | Resident | Type | Date | CC | Description | Check | Amount | Balance |
|------|-------|----------|------|------|----|-----------|-------|--------|---------|
| 1119 | 01 | Clemencia Charles | App# | 60305 | | | Beg Bal | | 0.00 |
| | | 8500 Biscayne Blvd # R1119 | Chg | 09/01/2010 | R1 | Rent | | 440.00 | 440.00 |
| | | Miami FL 33138 | Pay | 09/01/2010 | | PAYMENT | 67212 | -440.00 | 0.00 |
| | | | Pay | 09/30/2010 | | PAYMENT | 67743 | -440.00 | -440.00 |
| | | | Chg | 10/01/2010 | R1 | Rent | | 440.00 | 0.00 |
| | | | Chg | 11/01/2010 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 11/05/2010 | | PAYMENT | 29498 | -440.00 | 0.00 |
| | | | Chg | 12/01/2010 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 12/06/2010 | | PAYMENT | 85357 | -440.00 | 0.00 |
| | | | Chg | 01/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 01/10/2011 | | PAYMENT | 50500 | -440.00 | 0.00 |
| | | | Chg | 02/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 02/08/2011 | | PAYMENT | 75087 | -440.00 | 0.00 |
| | | | Chg | 03/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 03/09/2011 | | PAYMENT | 852750 | -440.00 | 0.00 |
| | | | Chg | 04/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 04/18/2011 | | PAYMENT | 115331 | -440.00 | 0.00 |
| | | | Chg | 05/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 05/11/2011 | | PAYMENT | 115439 | -440.00 | 0.00 |
| | | | Chg | 06/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 06/15/2011 | | PAYMENT | 305197 | -440.00 | 0.00 |
| | | | Chg | 07/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 07/26/2011 | | PAYMENT | 026711 | -440.00 | 0.00 |
| | | | Chg | 08/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 08/27/2011 | | PAYMENT | 649380 | -440.00 | 0.00 |
| | | | Chg | 09/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 09/27/2011 | | PAYMENT | 324047 | -440.00 | 0.00 |
| | | | Chg | 10/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 10/28/2011 | | PAYMENT | 333111 | -440.00 | 0.00 |
| | | | Chg | 11/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 11/30/2011 | | PAYMENT | 339447 | -440.00 | 0.00 |
| | | | Chg | 12/01/2011 | R1 | Rent | | 440.00 | 440.00 |
| | | | Chg | 01/01/2012 | R1 | Rent | | 440.00 | 880.00 |
| | | | Pay | 01/16/2012 | | PAYMENT | | -440.00 | 440.00 |
| | | | Chg | 02/01/2012 | R1 | Rent | | 440.00 | 880.00 |
| | | | Pay | 02/01/2012 | | PAYMENT | 414066 | -440.00 | 440.00 |
| | | | Pay | 02/28/2012 | | PAYMENT | 420979 | -440.00 | 0.00 |
| | | | Chg | 03/01/2012 | R1 | Rent | | 440.00 | 440.00 |
| | | | Chg | 04/01/2012 | R1 | Rent | | 440.00 | 880.00 |
| | | | Pay | 04/02/2012 | | PAYMENT | 677244 | -440.00 | 440.00 |
| | | | Pay | 04/30/2012 | | PAYMENT | 202588 | -440.00 | 0.00 |
| | | | Chg | 05/01/2012 | R1 | Rent | | 440.00 | 440.00 |
| | | | Chg | 06/01/2012 | R1 | Rent | | 440.00 | 880.00 |
| | | | Pay | 06/01/2012 | | PAYMENT | 428260 | -440.00 | 440.00 |
| | | | Pay | 06/29/2012 | | PAYMENT | 281925 | -440.00 | 0.00 |
| | | | Rev | 06/29/2012 | | CASH REVERSAL | 281925 | 440.00 | 440.00 |
| | | | Chg | 07/01/2012 | R1 | Rent | | 440.00 | 880.00 |
| | | | Chg | 08/01/2012 | R1 | Rent | | 440.00 | 1,320.00 |
| | | | Pay | 08/01/2012 | | PAYMENT | 822813 | -440.00 | 880.00 |
| | | | Pay | 08/20/2012 | | PAYMENT | 787849 | -440.00 | 440.00 |
| | | | Chg | 09/01/2012 | R1 | Rent | | 440.00 | 880.00 |
| | | | Pay | 09/19/2012 | | PAYMENT | 281925 | -440.00 | 440.00 |
| | | | Chg | 10/01/2012 | R1 | Rent | | 440.00 | 880.00 |
| | | | Pay | 10/02/2012 | | PAYMENT | 284502 | -440.00 | 440.00 |
| | | | Pay | 10/31/2012 | | PAYMENT | 121388 | -440.00 | 0.00 |
| | | | Chg | 11/01/2012 | R1 | Rent | | 440.00 | 440.00 |
| | | | Pay | 11/27/2012 | | PAYMENT | 529793 | -440.00 | 0.00 |
| | | | Chg | 12/01/2012 | R1 | Rent | | 440.00 | 440.00 |
| | | | Chg | 01/01/2013 | R1 | Rent | | 440.00 | 880.00 |
| | | | Pay | 01/14/2013 | | PAYMENT | 121793 | -800.00 | 80.00 |
| | | | Chg | 02/01/2013 | R1 | Rent | | 440.00 | 520.00 |
| | | | Pay | 02/25/2013 | | PAYMENT | 699516 | -420.00 | 100.00 |
| | | | Chg | 03/01/2013 | R1 | Rent | | 440.00 | 540.00 |
| | | | Pay | 03/26/2013 | | PAYMENT | 180436 | -440.00 | 100.00 |
| | | | Chg | 04/01/2013 | R1 | Rent | | 440.00 | 540.00 |
| | | | Chg | 05/01/2013 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 05/01/2013 | | PAYMENT | 217787 | -440.00 | 540.00 |
| | | | Pay | 05/31/2013 | | PAYMENT | 183160 | -440.00 | 100.00 |
| | | | Chg | 06/01/2013 | R1 | Rent | | 440.00 | 540.00 |
| | | | Chg | 07/01/2013 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 07/02/2013 | | PAYMENT | 185397 | -440.00 | 540.00 |
| | | | Chg | 08/01/2013 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 08/02/2013 | | PAYMENT | 087185 | -440.00 | 540.00 |
| | | | Pay | 08/30/2013 | | PAYMENT | 354571 | -440.00 | 100.00 |
| | | | Chg | 09/01/2013 | R1 | Rent | | 440.00 | 540.00 |
| | | | Chg | 10/01/2013 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 10/09/2013 | | PAYMENT | 352095 | -880.00 | 100.00 |

**Debtor's Appendix in Support of her Objection to Claim**                                                          **A.1**

Resident Transaction Report
Wealthy Delight, LLC
Start Date 01/01/2010

08-3531
Wealthy Delight LLC
8500 Biscayne Blvd #A154
Miami FL 33138

KW Property Management & Cons.
8200 NW 33rd Street, Suite 300
Doral FL 33122

| Unit | Space | Resident | Type | Date | CC | Description | Check | Amount | Balance |
|------|-------|----------|------|------|----|-----------  |-------|--------|---------|
| | | | Chg | 11/01/2013 | R1 | Rent | | 440.00 | 540.00 |
| | | | Chg | 12/01/2013 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 12/24/2013 | | PAYMENT | 800585 | -880.00 | 100.00 |
| | | | Chg | 01/01/2014 | R1 | Rent | | 440.00 | 540.00 |
| | | | Pay | 01/16/2014 | | PAYMENT | 696696 | -440.00 | 100.00 |
| | | | Chg | 02/01/2014 | R1 | Rent | | 440.00 | 540.00 |
| | | | Chg | 03/01/2014 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 03/04/2014 | | PAYMENT | 370425 | -440.00 | 540.00 |
| | | | Pay | 03/21/2014 | | PAYMENT | 211419 | -440.00 | 100.00 |
| | | | Chg | 04/01/2014 | R1 | Rent | | 440.00 | 540.00 |
| | | | Chg | 05/01/2014 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 05/12/2014 | | PAYMENT | 242069 | -440.00 | 540.00 |
| | | | Chg | 06/01/2014 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 06/16/2014 | | PAYMENT | 948104 | -440.00 | 540.00 |
| | | | Chg | 07/01/2014 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 07/08/2014 | | PAYMENT | 174945 | -440.00 | 540.00 |
| | | | Chg | 08/01/2014 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 08/13/2014 | | PAYMENT | 045920 | -440.00 | 540.00 |
| | | | Chg | 09/01/2014 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 09/09/2014 | | PAYMENT | 038303 | -440.00 | 540.00 |
| | | | Chg | 10/01/2014 | R1 | Rent | | 440.00 | 980.00 |
| | | | Pay | 10/20/2014 | | PAYMENT | 486350 | -440.00 | 540.00 |
| | | | Chg | 11/01/2014 | R1 | Rent | | 440.00 | 980.00 |
| | | | Chg | 12/01/2014 | R1 | Rent | | 440.00 | 1,420.00 |
| | | | Pay | 12/03/2014 | | PAYMENT | 667023 | -440.00 | 980.00 |
| | | | Chg | 01/01/2015 | R1 | Rent | | 440.00 | 1,420.00 |
| | | | Pay | 01/14/2015 | | PAYMENT | 035333 | -440.00 | 980.00 |
| | | | Chg | 02/01/2015 | R1 | Rent | | 440.00 | 1,420.00 |
| | | | Chg | 03/01/2015 | R1 | Rent | | 440.00 | 1,860.00 |
| | | | Pay | 03/05/2015 | | PAYMENT | 737733 | -440.00 | 1,420.00 |
| | | | Chg | 04/01/2015 | R1 | Rent | | 440.00 | 1,860.00 |
| | | | Pay | 04/27/2015 | | PAYMENT | 040698 | -440.00 | 1,420.00 |
| | | | Chg | 05/01/2015 | R1 | Rent | | 440.00 | 1,860.00 |
| | | | Pay | 05/05/2015 | | PAYMENT | 355975 | -440.00 | 1,420.00 |
| | | | Chg | 06/01/2015 | R1 | Rent | | 440.00 | 1,860.00 |
| | | | Chg | 07/01/2015 | R1 | Rent | | 440.00 | 2,300.00 |
| | | | Chg | 08/01/2015 | R1 | Rent | | 440.00 | 2,740.00 |
| | | | Chg | 09/01/2015 | R1 | Rent | | 440.00 | 3,180.00 |
| | | | Chg | 10/01/2015 | R1 | Rent | | 440.00 | 3,620.00 |
| | | | | | | End Bal | | | 3,620.00 |

| Type: Charge or Payment | Date | Description | Money Order No. | Amount | Balance | Credited on rent ledger? | Receipt? | Notes |
|---|---|---|---|---|---|---|---|---|
| Payment | 8/27/2010 | Payment | 67212 | -440 | -440 | Yes | Yes | Wealthy Delight lists payment date as 9/1/10 on its ledger, but receipt states 8/27/10. |
| Charge | 9/1/2010 | Rent charge | | 440 | 0 | | | |
| Payment | 9/30/2010 | Payment | 67743 | -440 | -440 | Yes | Yes | |
| Charge | 10/1/2010 | Rent charge | | 440 | 0 | | | |
| Charge | 11/1/2010 | Rent charge | | 440 | 440 | | | |
| Payment | 11/5/2010 | Payment | 29498 | -440 | 0 | Yes | No | |
| Charge | 12/1/2010 | Rent charge | | 440 | 440 | | | |
| Payment | 12/6/2010 | Payment | 85357 | -440 | 0 | Yes | Yes | |
| Charge | 1/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 1/10/2011 | Payment | 50500 | -440 | 0 | Yes | Yes | |
| Charge | 2/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 2/7/2011 | Payment | 75087 | -440 | 0 | Yes | Yes | Wealthy Delight lists payment date as 2/8/11 on its ledger, but receipt states 2/7/11. |
| Charge | 3/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 3/8/2011 | Payment | 852750 | -440 | 0 | Yes | Yes | Wealthy Delight lists payment date as 3/9/11 on its ledger, but receipt states 3/8/11. |
| Charge | 4/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 4/15/2011 | Payment | 115331 | -440 | 0 | Yes | Yes | Wealthy Delight lists payment date as 4/18/11 on its ledger, but receipt states 4/15/11. |
| Charge | 5/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 5/13/2011 | Payment | 115439 | -440 | 0 | Yes | Yes | Wealthy Delight lists payment date as 5/11/11 on its ledger, but receipt states 5/13/11. |
| Charge | 6/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 6/14/2011 | Payment | 305197 | -440 | 0 | Yes | | Wealthy Delight lists payment date as 6/14/11 on its ledger, but receipt states 6/15/11. |
| Charge | 7/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 7/25/2011 | Payment | 26711 | -440 | 0 | Yes | Yes | Wealthy Delight lists payment date as 7/29/11 on its ledger, but receipt states 7/25/11. |
| Charge | 8/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 8/25/2011 | Payment | 649380 | -440 | 0 | Yes | Yes | Wealthy Delight lists payment date as 8/27/11 on its ledger, but receipt states 8/25/11. |
| Charge | 9/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 9/19/2011 | Payment | 324047 | -440 | 0 | Yes | Yes | Wealthy Delight lists payment date as 9/27/11 on its ledger, but receipt states 9/19/11. |
| Charge | 10/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 10/24/2011 | Payment | 333111 | -440 | 0 | Yes | Yes | Wealthy Delight lists payment date as 10/28/11 on its ledger, but receipt states 10/24/11. |
| Charge | 11/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 11/28/2011 | Payment | 339447 | -440 | 0 | Yes | | Wealthy Delight lists payment date as 11/30/11 on its ledger, but receipt states 11/28/11. |
| Charge | 12/1/2011 | Rent charge | | 440 | 440 | | | |
| Payment | 12/27/2011 | Payment | 809044 | -440 | 0 | No | Yes | Receipt No. 578500 from Wealthy Delight for Money Order No. 104528809044 in the amount of $440. Never credited on Clemencia Charles' rent ledger. |
| Charge | 1/1/2012 | Rent charge | | 440 | 440 | | | |
| Payment | 1/16/2012 | Payment | ? | -440 | 0 | Yes | | No money order number is listed on Wealty Delight's rent ledger. |
| Payment | 1/24/2012 | Payment | 414066 | -440 | -440 | Yes | Yes | Wealthy Delight lists payment date as 2/1/12 on its ledger, but receipt states 1/24/12. |
| Charge | 2/1/2012 | Rent charge | | 440 | 0 | | | |

**Debtor's Appendix in Support of her Objection to Claim**      **A.3**

| Type: Charge or Payment | Date | Description | Money Order No. | Amount | Balance | Credited on rent ledger? | Receipt? | Notes |
|---|---|---|---|---|---|---|---|---|
| Payment | 2/28/2012 | Payment | 420979 | -440 | -440 | Yes | Yes | Money Order No. is 420479. |
| Charge | 3/1/2012 | Rent charge | | 440 | 0 | | | |
| Charge | 4/1/2012 | Rent charge | | 440 | 440 | | | |
| Payment | 4/2/2012 | Payment | 677244 | -440 | 0 | Yes | Yes | |
| Payment | 4/30/2012 | Payment | 202588 | -440 | -440 | Yes | Yes | |
| Charge | 5/1/2012 | Rent charge | | 440 | 0 | | | |
| Charge | 6/1/2012 | Rent charge | | 440 | 440 | | | |
| Payment | 6/1/2012 | Payment | 428260 | -440 | 0 | Yes | Yes | |
| Payment | 6/26/2012 | Payment | 281925 | -440 | -440 | Yes | Yes | Wealthy Delight lists payment date as 6/29/12 on its ledger, but receipt states 6/26/12. Also, Wealthy Delight lists this as a "cash reversal" on its ledger - it should not have been reversed. Clemencia Charles has a receipt and the stub from the original money order, and should be credited accordingly. |
| Charge | 7/1/2012 | Rent charge | | 440 | 0 | | | |
| Payment | 7/31/2012 | Payment | 822813 | -440 | -440 | Yes | Yes | Wealthy Delight lists payment date as 8/1/12 on its ledger, but receipt states 7/31/12. |
| Charge | 8/1/2012 | Rent charge | | 440 | 0 | | | |
| Payment | 8/20/2012 | Payment | 787849 | -440 | -440 | Yes | Yes | |
| Charge | 9/1/2012 | Rent charge | | 440 | 0 | | | |
| Payment | 9/19/2012 | Payment | 281925 | -440 | -440 | Yes | No | |
| Payment | 9/26/2012 | Payment | 284502 | -440 | -880 | Yes | Yes | Wealthy Delight lists payment date as 10/1/12 on its ledger, but receipt states 9/26/12. |
| Charge | 10/1/2012 | Rent charge | | 440 | -440 | | | |
| Payment | 10/26/2012 | Payment | 529793 | -440 | -880 | Yes | Yes | Wealthy Delight lists payment date as 11/27/12 on its ledger, but receipt states 10/26/12. |
| Payment | 10/29/2012 | Payment | 121388 | -440 | -1320 | Yes | Yes | Wealthy Delight lists payment date as 10/1/12 on its ledger, but receipt states 10/29/12. |
| Charge | 11/1/2012 | Rent charge | | 440 | -880 | | | |
| Charge | 12/1/2012 | Rent charge | | 440 | -440 | | | |
| Charge | 1/1/2013 | Rent charge | | 440 | 0 | | | |
| Payment | 1/8/2013 | Payment | 121793 | -800 | -800 | Yes | Yes | Wealthy Delight lists payment date as 1/14/13 on its ledger, but receipt states 1/8/13. |
| Charge | 2/1/2013 | Rent charge | | 440 | -360 | | | |
| Payment | 2/19/2013 | Payment | 699516 | -420 | -780 | Yes | Yes | Wealthy Delight lists payment date as 2/20/13 on its ledger, but receipt states 2/19/13. |
| Charge | 3/1/2013 | Rent charge | | 440 | -340 | | | |
| Payment | 3/26/2013 | Payment | 180436 | -440 | -780 | Yes | No | |
| Charge | 4/1/2013 | Rent charge | | 440 | -340 | | | |
| Payment | 4/29/2013 | Payment | 217787 | -440 | -780 | Yes | Yes | Wealthy Delight lists payment date as 5/1/13 on its ledger, but receipt states 4/29/13. |
| Charge | 5/1/2013 | Rent charge | | 440 | -340 | | | |
| Payment | 5/31/2013 | Payment | 183160 | -440 | -780 | Yes | Yes | |
| Charge | 6/1/2013 | Rent charge | | 440 | -340 | | | |
| Payment | 6/27/2013 | Payment | 185397 | -440 | -780 | Yes | Yes | Wealthy Delight lists payment date as 7/2/13 on its ledger, but receipt states 6/27/13. |
| Charge | 7/1/2013 | Rent charge | | 440 | -340 | | | |
| Charge | 8/1/2013 | Rent charge | | 440 | 100 | | | |
| Payment | 8/2/2013 | Payment | 87185 | -440 | -340 | Yes | No | |
| Payment | 8/30/2013 | Payment | 354571 | -440 | -780 | Yes | Yes | |
| Charge | 9/1/2013 | Rent charge | | 440 | -340 | | | |
| Charge | 10/1/2013 | Rent charge | | 440 | 100 | | | |

**Debtor's Appendix in Support of her Objection to Claim**                 **A.4**

| Type: Charge or Payment | Date | Description | Money Order No. | Amount | Balance | Credited on rent ledger? | Receipt? | Notes |
|---|---|---|---|---|---|---|---|---|
| Payment | 10/7/2013 | Payment | 352095 | -880 | -780 | Yes | Yes | Wealthy Delight lists payment date as 10/9/13 on its ledger, but receipt states 10/7/13. |
| Charge | 11/1/2013 | Rent charge | | 440 | -340 | | | |
| Charge | 12/1/2013 | Rent charge | | 440 | 100 | | | |
| Payment | 12/13/2013 | Payment | 800585 | -880 | -780 | Yes | Yes | Wealthy Delight lists payment date as 12/24/13 on its ledger, but receipt states 12/13/13. |
| Charge | 1/1/2014 | Rent charge | | 440 | -340 | | | |
| Payment | 1/15/2014 | Payment | 696696 | -440 | -780 | Yes | Yes | Wealthy Delight lists payment date as 1/16/14 on its ledger, but receipt states 1/15/14. |
| Charge | 2/1/2014 | Rent charge | | 440 | -340 | | | |
| Payment | 2/19/2014 | Payment | 370425 | -440 | -780 | Yes | Yes | Wealthy Delight lists payment date as 3/4/14 on its ledger, but receipt states 2/19/14. |
| Charge | 3/1/2014 | Rent charge | | 440 | -340 | | | |
| Payment | 3/14/2014 | Payment | 211419 | -440 | -780 | Yes | Yes | Wealthy Delight lists payment date as 3/20/14 on its ledger, but receipt states 3/14/14. |
| Charge | 4/1/2014 | Rent charge | | 440 | -340 | | | |
| Charge | 5/1/2014 | Rent charge | | 440 | 100 | | | |
| Payment | 5/12/2014 | Payment | 242069 | -440 | -340 | Yes | No | |
| Charge | 6/1/2014 | Rent charge | | 440 | 100 | | | |
| Payment | 6/6/2014 | Payment | 948104 | -440 | -340 | Yes | Yes | Wealthy Delight lists payment date as 6/16/14 on its ledger, but receipt states 6/6/14. |
| Charge | 7/1/2014 | Rent charge | | 440 | 100 | | | |
| Payment | 7/1/2014 | Payment | 174945 | -440 | -340 | Yes | Yes | Wealthy Delight lists payment date as 7/8/14 on its ledger, but receipt states 7/1/14. |
| Charge | 8/1/2014 | Rent charge | | 440 | 100 | | | |
| Payment | 8/6/2014 | Payment | 45920 | -440 | -340 | Yes | Yes | Wealthy Delight lists payment date as 8/13/14 on its ledger, but receipt states 8/6/14. |
| Charge | 9/1/2014 | Rent charge | | 440 | 100 | | | |
| Payment | 9/5/2014 | Payment | 38303 | -440 | -340 | Yes | Yes | Wealthy Delight lists payment date as 9/9/14 on its ledger, but receipt states 9/5/14. |
| Charge | 10/1/2014 | Rent charge | | 440 | 100 | | | |
| Payment | 10/17/2014 | Payment | 486350 | -440 | -340 | Yes | Yes | Wealthy Delight lists payment date as 10/20/14 on its ledger, but receipt states 10/17/14. |
| Charge | 11/1/2014 | Rent charge | | 440 | 100 | | | |
| Charge | 12/1/2014 | Rent charge | | 440 | 540 | | | |
| Payment | 12/2/2014 | Payment | 667023 | -440 | 100 | Yes | Yes | Wealthy Delight lists payment date as 12/3/14 on its ledger, but receipt states 12/2/14. |
| Charge | 1/1/2015 | Rent charge | | 440 | 540 | | | |
| Payment | 1/13/2015 | Payment | 35333 | -440 | 100 | Yes | Yes | Wealthy Delight lists payment date as 1/14/15 on its ledger, but receipt states 1/13/15. |
| Charge | 2/1/2015 | Rent charge | | 440 | 540 | | | |
| Payment | 2/27/2015 | Payment | 737733 | -440 | 100 | Yes | Yes | Wealthy Delight lists payment date as 3/5/15 on its ledger, but receipt states 2/27/15. |
| Charge | 3/1/2015 | Rent charge | | 440 | 540 | | | |
| Payment | 3/31/2015 | Payment | 40698 | -440 | 100 | Yes | Yes | Wealthy Delight lists payment date as 4/27/15 on its ledger, but receipt states 3/31/15. |
| Charge | 4/1/2015 | Rent charge | | 440 | 540 | | | |
| Payment | 4/28/2015 | Payment | 355975 | -440 | 100 | Yes | Yes | Wealthy Delight lists payment date as 5/5/15 on its ledger, but receipt states 4/28/15. |
| Charge | 5/1/2015 | Rent charge | | 440 | 540 | | | |

**Debtor's Appendix in Support of her Objection to Claim**      **A.5**

*Clemencia Charles - Rent Calculations as of November 25, 2015*

| Type: Charge or Payment | Date | Description | Money Order No. | Amount | Balance | Credited on rent ledger? | Receipt? | Notes |
|---|---|---|---|---|---|---|---|---|
| Charge | 6/1/2015 | Rent charge | | 440 | 980 | | | |
| Payment | 6/16/2015 | Payment into State Court Registry | 3510001 | -880 | 100 | No | Yes | |
| Charge | 7/1/2015 | Rent charge | | 440 | 540 | | | |
| Payment | 7/9/2015 | Payment into State Court Registry | 3250003 | -440 | 100 | No | Yes | |
| Charge | 8/1/2015 | Rent charge | | 440 | 540 | | | |
| Payment | 8/18/2015 | Payment into State Court Registry | 2860008 | -440 | 100 | No | Yes | |
| Charge | 9/1/2015 | Rent charge | | 440 | 540 | | | |
| Charge | 10/1/2015 | Rent charge | | 440 | 980 | | | |
| Payment | 10/6/2015 | Payment into Bankruptcy Court | | -440 | 540 | No | Yes | |
| Charge | 11/1/2015 | Rent charge | | 440 | 980 | | | |
| Payment | 11/19/2015 | Payment to Trustee | | -880 | 100 | No | Yes | |

**Debtor's Appendix in Support of her Objection to Claim** **A.6**

**RECEIPT** DATE 12/27/2011 No. 578500

RECEIVED FROM Clemencia Charles $ 440.00

_____ DOLLARS

⊘ FOR RENT Dic 2011 Lot R1119 mo# 809044
○ FOR _____

| ACCOUNT | 440 00 | ⊘ CASH | |
| PAYMENT | 440 00 | ⊘ CHECK | FROM 12/1 TO 12/31/2011 |
| BAL. DUE | 0 | ⊘ MONEY ORDER | |
| | | ○ CREDIT CARD | BY |



MONEYGRAM PAYMENT SYSTEMS, INC. DRAWER
P.O. BOX 9476
MINNEAPOLIS, MN 55480
PLEASE READ REVERSE SIDE   **www.moneygram.com**

RECEIPT
RECIBO

DATE/AMOUNT

1045 2880 9044
094
9730501021000801                    42

R 1045 28809044

EMPLOYEE
715 (10/10) 700/14000
M 98191-S

▼DETACH HERE▼

KEEP A COPY OF THIS STUB
FOR YOUR RECORDS/
MANTENGA UNA COPIA DE
ESTE RECIBO PARA SUS ARCHIVOS

MoneyGram.
Money Orders

**RECEIPT** DATE 6/26/16     No. 308679

RECEIVED FROM _Cimexen Charles_    $ 440.00

833 1119      #4458 1925     **DOLLARS**

○ FOR RENT
○ FOR _June 2015_

| ACCOUNT | 440.00 | ○ CASH | FROM | TO |
|---------|--------|--------|------|----|
| PAYMENT | 440.00 | ● CHECK | | |
| BAL. DUE | 0 | ○ MONEY ORDER | | |
| | | ○ CREDIT CARD | BY _Ada_ | |

3-11



**CUSTOMER'S RECEIPT**

**UNITED STATES POSTAL SERVICE®**

KEEP THIS
RECEIPT FOR
YOUR RECORDS

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION
**NOT
NEGOTIABLE**

Pay to

Address

| Serial Number | Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|---|
| 20044281925 | 2012-06-26 | 331530 | $440.00 | 0005 |



# Miami-Dade County Civil, Family and Probate Courts Online System

**◄◄ Back to Results**

## WEALTHY DELIGHT (LLC) VS. CLEMENCIA CHARLES

**Local Case Number:** 2015-009952-CC-23

**Filing Date:** 06/01/2015

**State Case Number:** 132015CC009952000023

**Case Type:** Evictions < $15,000

**Consolidated Case No.:** N/A

**Judicial Section:** ND02

**Case Status:** CLOSED

---

**👥 Parties**                                   **Number of Parties: 3 ➕**

---

**🔧 Hearing Details**                           **Number of Hearing: 1 ➕**

---

**🔊 Dockets**                                   **Dockets Retrieved: 47 ➖**

| Date | Book/Page | Docket Entry | Event Type | Comments |
|------|-----------|--------------|------------|----------|

| | | | | |
|---|---|---|---|---|
| | 10/04/2015 | | Suggestion of Bankruptcy | Judgment | |
| 📄 | 10/04/2015 | 29802:640 | Suggestion of Bankruptcy | Event | *Parties: Charles Clemencia* |
| | 09/29/2015 | | Text | Event | **DUPLICATE CHECK RETURNED TO ATTY** |
| | 09/29/2015 | | Writ of Possession Issued | Service | |
| 📄 | 09/29/2015 | | Writ of Possession Issued | Event | *Parties: Charles Clemencia* |
| 📄 | 09/15/2015 | | Returned Mail | Event | |
| 📄 | 09/08/2015 | | Memorandum of Disposition | Event | |
| 📄 | 09/08/2015 | | Order: | Event | **DENYING EMERGENCY MOTION TO STAY WRIT & DENYING MOTION TO VACATE DEFAULT JUDGMENT** |
| | 09/08/2015 | | Landlord and Tenant | Hearing | |
| 📄 | 09/04/2015 | | Order: | Event | **STAYING WRIT OF POSSESSION** |
| 📄 | 09/03/2015 | 29827:4943 | Notice of Appeal | Event | *Parties: Charles Clemencia* |
| 📄 | 09/03/2015 | | Notice of Hearing- | Event | **9/8/2015 AT 11:00 EVIDENTIARY** |
| 📄 | 09/03/2015 | | Order: | Event | **AMENDING CASE NUMBER ON ORDER DATED AUGUST 27,2015** |
| 📄 | 09/02/2015 | | Motion to Stay | Event | |
| 📄 | 09/02/2015 | | Motion to Vacate Judgment | Event | |
| 📄 | 09/02/2015 | | Notice of Filing: | Event | **DEFENDANT'S VERIFIED EMERGENCY MOTION** |
| 📄 | 08/28/2015 | | Order: | Event | **STAYING DEFT WRIT OF POSSESSION DEPOSIT TO BE $1470.00 IN CTREG** |
| 📄 | 08/27/2015 | | Motion: | Event | **FOR LEAVE TO AMEND ANSWER** |

| | | | | |
|---|---|---|---|---|
| 📄 | 08/26/2015 | Motion: | Event | **FOR LEAVE TO AMEND ANSWER** |
| 📄 | 08/25/2015 | Notice of Unavailability/absence | Event | |
| 📄 | 08/20/2015  29748:372 | Default Final Judgment | Event | *Parties: Charles Clemencia* |
| | 08/20/2015 | Default Final Judgment | Judgment | |
| 📄 | 08/20/2015 | Order of Default | Event | **AND STRIKING ANSWER** *Parties: Charles Clemencia* |
| | 08/18/2015 | Receipt: | Event | **RECEIPT#:2860008 AMT PAID:$453.20 NAME:CLEMENCIA CHARLES ALLOCATION CODE QUANTITY UNIT AMOUNT 2106-COURT REGISTRY DEP 1 $440.00 $440.00 2108-COURT REGISTRY FEE 1 $13.20 $13.20 TENDER TYPE:CASH TENDER AMT:$460.20 TENDER** |
| 📄 | 08/13/2015 | Memorandum | Event | **AND OPPOSITION TO RESPONSE** |
| | 07/09/2015 | Receipt: | Event | **RECEIPT#:3250003 AMT PAID:$453.20 NAME:CLEMENCIA CHARLES 8500 BISCAYNE BLVD LOT R1119 MIAMI, FL 33138 ALLOCATION CODE QUANTITY UNIT AMOUNT 2106-COURT REGISTRY DEP 1 $440.00 $440.00 2108-COURT REGISTRY FEE 1 $13.20 $13.20 TENDER TYPE** |
| 📄 | 07/06/2015 | Notice of Appearance | Event | |
| 📄 | 07/01/2015 | Response: | Event | **TO MOTION TO STRIKE** |
| 📄 | 06/27/2015 | Notice: | Event | **SUPPLEMENT TO MOTION TO STRIKE** |
| 📄 | 06/24/2015 | Motion to Strike | Event | |
| 📄 | 06/23/2015 | Notice of Default Not Entered | Event | **ANSWER FILED.** *Parties: Charles Clemencia* |
| 📄 | 06/22/2015 | Affidavit of Non- | Event | |

| | | Payment | | |
|---|---|---|---|---|
| 📄 | 06/22/2015 | Affidavit as to Costs | Event | |
| 📄 | 06/22/2015 | Non-Military Affidavit | Event | |
| 📄 | 06/22/2015 | Motion for Default | Event | |
| 📄 | 06/16/2015 | Service Returned | Event | |
| | 06/16/2015 | Receipt: | Event | **RECEIPT#:3510001 AMT PAID:$900.70 ALLOCATION CODE QUANTITY UNIT AMOUNT 2106-COURT REGISTRY DEP 1 $880.00 $880.00 2108-COURT REGISTRY FEE 1 $20.70 $20.70 TENDER TYPE:CASH TENDER AMT:$901.00 TENDER TYPE:CHANGE** |
| 📄 | 06/16/2015 | Demand for Jury Trial | Event | |
| 📄 | 06/16/2015 | Answer and Affirmative Defense | Event | *Parties: Charles Clemencia* |
| 📄 | 06/16/2015 | Motion: | Event | **TO DETERMINE RENT** |
| | 06/16/2015 | Answer | Event | *Parties: Charles Clemencia* |
| | 06/08/2015 | Receipt: | Event | **RECEIPT#:3570112 AMT PAID:$10.00 NAME:KUKER, HOWARD LEWIS 508 DADELAND TOWERS NORTH MIAMI FL 33156 ALLOCATION CODE QUANTITY UNIT AMOUNT 2139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:CHECK TENDER AMT:$10.00 TENDER TYPE:** |
| | 06/08/2015 | Summons and Complaint Mailed | Event | *Parties: Charles Clemencia* |
| | 06/08/2015 | 5 Day Summons Issued | Service | |
| | 06/08/2015 | 5 Day Summons Issued | Event | *Parties: Wealthy Delight (LLC); Charles Clemencia* |
| | 06/02/2015 | Receipt: | Event | **RECEIPT#:3750048 AMT** |

**PAID:$185.00 NAME:KUKER, HOWARD LEWIS 508 DADELAND TOWERS NORTH MIAMI FL 33156 ALLOCATION CODE QUANTITY UNIT AMOUNT 2100-COUNTY FILING FEE 1 $185.00 $185.00 TENDER TYPE:E-FILING ACH TENDER AMT:$185.00 RECEIPT DA**

| | | | |
|---|---|---|---|
| 📄 | 06/01/2015 | Complaint | Event |

**◀◀ Back to Results**

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services (https://www2.miami-dadeclerk.com/Developers). To review the complete Miami-Dade County Disclaimer, follow this link: http://www.miamidade.gov/info/disclaimer.asp (http://www.miamidade.gov/info/disclaimer.asp)

Online Case Home (default.aspx) |

Family Court Information (http://www.miami-dadeclerk.com/families_court.asp) |

Probate Court Information (http://www.miami-dadeclerk.com/families_probate.asp) |

Email (http://feedback.miamidade.gov/Community/se.ashx?s=57F314587A23E37E) |

Login (/PremierServices/login.aspx?ReturnUrl=https://www2.miami-dadeclerk.com/ocs/Search.aspx)

Home (http://www.miami-dadeclerk.com/home.asp) |

Privacy Statement (http://www.miamidade.gov/info/privacy_and_security.asp) | (http://www.miamidade.gov)

Disclaimer (http://www.miamidade.gov/info/disclaimer.asp) |

Contact Us (http://www.miami-dadeclerk.com/contact.asp) |

About Us (http://www.miami-dadeclerk.com/about.asp)

2015 Clerk of the Courts. All Rights reserved.

S0142976

**UNITED STATES**
**BANKRUPTCY COURT**
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**# 310318    — LL**

**October 06, 2015**
**10:35:12**

**RENT DEPOSIT**
**15-27703-RAM13**

Debtor.: CLEMENCIA CHARLES
Judge..: ROBERT A MARK
Trustee: Nancy Neidich
Amount.:                         $440.00 CH
Check#.: 2322

**Total->   $440.00**

LEGAL SERVICES OF GREATER MIAMI, INC.
TRUST ACCOUNT - MAIN OFFICE
3000 BISCAYNE BOULEVARD, SUITE 500
MIAMI, FLORIDA 33137

REGIONS BANK
MIAMI, FLORIDA
63-466/631

2359

| | DATE | NUMBER | AMOUNT |
|---|---|---|---|
| | 11/18/2015 | 2359 | *****$61.00 |

*** SIXTY-ONE & 00/100 DOLLARS

PAY

TO THE
ORDER OF

Nancy K. Neidich, Ch. 13 Trustee
Post Office Box 279806
Miramar, FL 33027

*VOID AFTER 180 DAYS
TWO SIGNATURES REQUIRED

_____
AUTHORIZED SIGNATURE

_____
AUTHORIZED SIGNATURE

15-27703-RAM; Clemencia Charles

⑈002359⑈ ⑆063104668⑆ 154869226⑈

---

LEGAL SERVICES OF GREATER MIAMI, INC. - TRUST ACCOUNT - MAIN OFFICE

| | | PAY TO | Nancy K. Neidich, Ch. 13 Trustee | |
|---|---|---|---|---|
| DATE | TRUST NAME | | DESCRIPTION | AMOUNT |
| 11/18/2015 | Clemencia Charles<br>Account: 150451181.00-1 | | 15-27703-RAM; Clemencia Charles | 61.00 |

| CHECK DATE | CHECK NO. | | CHECK AMOUNT |
|---|---|---|---|
| 11/18/2015 | 2359 | | 61.00 |

---

LEGAL SERVICES OF GREATER MIAMI, INC. - TRUST ACCOUNT - MAIN OFFICE

Pay To: Nancy K. Neidich, Ch. 13 Trustee

| Date | Trust Name | Description | Amount |
|---|---|---|---|
| 11/18/2015 | Clemencia Charles<br>Account: 150451181.00-1 | 15-27703-RAM; Clemencia Charles | 61.00 |

| | Check Date | Check # | Check Amt |
|---|---|---|---|
| | 11/18/2015 | 2359 | 61.00 |

[L1329AHT] 5362003

**Debtor's Appendix in Support of her Objection to Claim**

A.17

LEGAL SERVICES OF GREATER MIAMI, INC.
TRUST ACCOUNT - MAIN
3000 BISCAYNE BOULEVARD, ... 500
MIAMI, FLORIDA 33137

REGIONS BANK
MIAMI, FLORIDA
63-466/631

2360

| | DATE | NUMBER | AMOUNT |
|---|---|---|---|
| | 11/18/2015 | 2360 | ****$907.00 |

PAY

*** NINE HUNDRED SEVEN & 00/100 DOLLARS

VOID AFTER 180 DAYS
TWO SIGNATURES REQUIRED

TO THE
ORDER OF

Nancy K. Neidich, Ch. 13 Trustee
Post Office Box 279806
Miramar, FL 33027

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE

15-27703-RAM; Clemencia Charles

⑆002360⑈ ⑆063104668⑆ 154869226⑈

LEGAL SERVICES OF GREATER MIAMI, INC. - TRUST ACCOUNT - MAIN OFFICE

| | | PAY TO Nancy K. Neidich, Ch. 13 Trustee | |
|---|---|---|---|
| DATE | TRUST NAME | DESCRIPTION | AMOUNT |
| 11/18/2015 | Clemencia Charles<br>Account: 150451843.00-1 | 15-27703-RAM; Clemencia Charles | 907.00 |

| CHECK DATE | CHECK NO. | | CHECK AMOUNT |
|---|---|---|---|
| 11/18/2015 | 2360 | | 907.00 |

LEGAL SERVICES OF GREATER MIAMI, INC. - TRUST ACCOUNT - MAIN OFFICE

Pay To: Nancy K. Neidich, Ch. 13 Trustee

| Date | Trust Name | Description | Amount |
|---|---|---|---|
| 11/18/2015 | Clemencia Charles<br>Account: 150451843.00-1 | 15-27703-RAM; Clemencia Charles | 907.00 |

| | Check Date | Check # | Check Amt |
|---|---|---|---|
| | 11/18/2015 | 2360 | 907.00 |

[L1329AHT] 5362003

**Debtor's Appendix in Support of her Objection to Claim**      **A.18**

IN THE COUNTY COURT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2015-10110-CC-23(04)


WEALTHY DELIGHT, LLC,

       Plaintiff,

-vs-

NELLY SHIRLEY,

       Defendant.

_____/




DEPOSITION OF ADDYS DOMINGUEZ

TAKEN ON BEHALF OF THE DEFENDANT
Wednesday, October 21, 2015
1:40 p.m. To 4:00 p.m.

LEGAL SERVICES OF GREATER MIAMI, INC.
3000 Biscayne Boulevard, Suite 500
Miami, Florida




Reported By:
VICTORIA AIELLO MILLER, Court Reporter
Notary Public, State of Florida



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
 1              APPEARANCES OF COUNSEL

 2   ON BEHALF OF THE PLAINTIFF:

 3       EVIAN L. WHITE  , ESQUIRE
         LEGAL SERVICES OF GREATER MIAMI, INC.
 4       3000 Biscayne Boulevard
         Suite 500
 5       Miami, Florida 33137
         305.438.2552
 6       ewhite@legalservicesmiami.org

 7
     ON BEHALF OF THE DEFENDANT:
 8
         HOWARD L. KUKER, ESQUIRE
 9       LAW OFFICES OF HOWARD L. KUKER
         9200 South Dadeland Boulevard
10       508 Dadeland Towers North
         Miami, Florida 33156
11       305.670.0987
         hlkuker@kwglaw offices.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    INDEX OF WITNESSES

 2   WITNESS: ADDYS DOMINGUEZ
                                                  PAGE
 3
     DIRECT EXAMINATION
 4        BY EVIAN WHITE, ESQUIRE                     5

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Debtor's Appendix in Support of her Objection to Claim                A.21

1                    INDEX OF EXHIBITS

2    EXHIBIT           DESCRIPTION                    PAGE

3      A      Notice of Taking Deposition Duces Tecum    15

4      B      Welcome Letter                             16

5      C      List of Residents that Received Welcome    18
              Letter
6
       D      Demand for Lot Rental Payment Amount       19
7
       E      Rent Roll Report, 10/16/15                 19
8
       F      Rent Roll Report, 10/09/15                 20
9
       G      Notice of Closing, Change in Land Use      20
10
       H      Rent Receipt                               20
11
       I      Money Order Stub 17018177286               55
12
       J      Receipt Dated 02-24-15                     56
13
       K      Money Order dated 02-16-15 to Biscayne     57
14            Park

15     L      Receipt Dated 09-06-10                     58

16     M      Prospectus of Little Farm Mobile Home Park 70

17     N      Community Action Brochures                 72

18

19

20

21

22

23

24

25



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

1        Deposition taken before Victoria Aiello Miller,

2    Court Reporter and Notary Public in and for the State of

3    Florida at Large in the above cause.

4                        -   -   -

5    Thereupon,

6                    ADDYS DOMINGUEZ,

7    having been first duly sworn or affirmed, was examined

8    and testified as follows:

9                    DIRECT EXAMINATION

10   BY MS. WHITE:

11       Q.   **Good afternoon, Ms. Dominguez.**

12       A.   Good afternoon.

13       Q.   **First things first.  Have you ever had your**

14   **deposition taken before?**

15       A.   No.

16       Q.   **Never?**

17       A.   No.

18       Q.   **So we'll try to make it not too painful for**

19   **your first time here.  So just some general rules.  I**

20   **know you heard them already.  I'm going to repeat them**

21   **anyway so they're on the record.  Again, it's a little**

22   **unnatural in a deposition because while we're having a**

23   **conversation, our court reporter has to write down**

24   **everything that you and I say as well as your attorney.**

25   **So, everything is under oath.  So everything you say,**



1  you have to tell the truth in what you're saying because

2  it is under oath.  Do you understand that?

3       A.   Of course.

4       Q.   So when I ask you questions and when you're

5  answering, please make sure to answer yes or no or in

6  full sentences because our court reporter needs to write

7  it down, and she can't capture your head nod and shaking

8  or anything like that.

9            If at any time you need a break, to go to the

10  restroom, if you need some water, whatever it is, please

11  let me know and we can stop.  This is not a marathon.

12  We're not at the Olympics.  We do take breaks.  That

13  will be fine.  Just please let me know, okay?

14       A.   Okay.

15       Q.   Are you-- and I have to ask these questions--

16  are you taking any medication or any other substance

17  that would inhibit your ability to answer truthfully

18  today?

19       A.   No.

20       Q.   Are you taking any medication or any substance

21  that would inhibit your ability to remember anything?

22       A.   No.

23       Q.   Sometimes people answer yes, so I have to ask.

24  Sometimes your attorney may object to the questions that

25  I ask.  That's normal.  That's okay.  You have to answer



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1   the question even though your attorney may object.  The

2   only thing that you can't answer and you shouldn't

3   answer are any questions that deal with privilege.  And

4   that's a fancy way of saying anything you and your

5   attorney have discussed, not just discussed, but in

6   writing as well. And your attorney should and will jump

7   up and down and object if I ask a question like that,

8   which is why I'm not going to ask a question like that.

9   So just to be clear that you do have to answer the rest

10  of the questions.  Okay?

11      A.   Okay.

12      Q.   I know you meant okay but we have to get it

13  out of your mouth?

14      A.   I forgot.

15      Q.   That's okay.  Our court reporter will remind

16  you, believe me.

17           So let's get started with the rest of the

18  questions.  Would you please spell your full name?

19      A.   Addys, A-D-D-Y-S. Dominguez, D-O-M-I-N-G-U-E-

20  Z.

21      Q.   Do you have in middle name?

22      A.   Used to, Maria.

23      Q.   What happened to it?

24      A.   When I signed for American citizen, I took it

25  away, but it comes up once in a while.



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    Q.   Okay.   Right, because you have the option to

2  change your name once you become a citizen.

3    A.   I never use it, so I said, what am I going to

4  have it, so I said, take it away.

5    Q.   So you just have two names?

6    A.   Yeah.

7    Q.   Do you go by any other names?

8    A.   No.

9    Q.   Where are you from?

10    A.   Cuban.

11    Q.   How long ago did you naturalize?

12    A.   Wow, many years ago.  More than 20 years.

13    Q.   What is your date of birth?

14    A.   06-06-66.

15    Q.   That's easy to remember.

16    A.   Yeah, all the sixes.

17    Q.   What is your business address?

18    A.   8500 Biscayne Boulevard, Unite A154, El

19  Portal, Florida, 33138.  That is where I work.

20    Q.   Do you work for Wealthy Delight?

21    A.   I work for KW Property Management.

22    Q.   And Wealthy Delight contracts with KW Property

23  Management?

24    A.   Yes.

25    Q.   What is your business e-mail?



1         A.    adominguez@kwpropertymanagement.com.

2         Q.    **What is your business telephone number?**

3         A.    I don't know it by heart.

4         Q.    **Did you have it saved in your phone?**

5         A.    Let me see.  305-759-1283. I don't call my

6    cell.

7         Q.    **Right. Nobody really knows their own number**

8    **anymore.**

9               **What is your educational background?**

10        A.    High school.

11        Q.    **Here or in Cuba?**

12        A.    Here.

13        Q.    **Where did you go to high school?**

14        A.    Miami Springs High School.

15        Q.    **When did you graduate?**

16        A.    1984.

17        Q.    **Have you done any continuing education since**

18   **then?**

19        A.    No.

20        Q.    **Any training for your job?**

21        A.    I did some training with KW a couple years,

22   maybe two years ago.

23        Q.    **What kind of training?**

24        A.    Courses that they do.

25        Q.    **Like for what?**



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

**Debtor's Appendix in Support of her Objection to Claim**                                    **A.27**

1      A.    Assistant manager and manager, non-CAM.

2      Q.    **What does that mean?**

3      A.    When you have a CAM license and when you

4  don't, and I don't have one.

5      Q.    **And what is a CAM license?**

6      A.    A CAM license is to run properties after ten,

7  after ten units on a condo, you have to have a CAM.

8      Q.    **Oh, so if the condo has more than ten units,**

9  **the individual has to have a CAM license?**

10      A.    Correct.

11      Q.    **And is that through the State of Florida?**

12      A.    I really don't know how that works since I

13  don't have one.

14      Q.    **So your employer gives courses on assistant**

15  **manager and manager training for CAM and non-CAM folks,**

16  **right?**

17      A.    Uh-huh.

18      Q.    **Is that accurate?**

19      A.    Yes, it is.

20      Q.    **How long have you been at KW Property**

21  **Management?**

22      A.    Four years.

23      Q.    **What did you do before that?**

24      A.    I also, I owned a perfume store before that

25  and before that I worked on property commercial.



1      **Q.   So before KW Property Management, you owned a**

2  **perfume store?**

3      A.   Correct.

4      **Q.   How long did you do that?**

5      A.   Couple of years, I don't remember.

6      **Q.   More or less?**

7      A.   Three, four years.

8      **Q.   Okay.  And before the perfume store, you**

9  **managed a commercial property?**

10     A.   Yes, correct.

11     **Q.   What kind of property?**

12     A.   Commercial property.

13     **Q.   But what was it?**

14     A.   As a management as well.

15     **Q.   Was it a mobile home park?**

16     A.   No commercial property, business.

17     **Q.   Businesses?**

18     A.   Um-hmm, businesses.

19     **Q.   Restaurants?**

20     A.   Not particularly restaurants but back then

21  more computerized sales, office stores, flower stores.

22  It was a big commercial property.

23     **Q.   Like a strip mall?**

24     A.   Yeah.

25     **Q.   Are you-- We'll get back to more details about**



Debtor's Appendix in Support of her Objection to Claim          A.29

1   your work and all of that soon, but are you involved in

2   any other litigation?

3        A.   No.

4        Q.   Have you ever been involved in any other

5   litigation?

6        A.   No.

7        Q.   Have you ever been arrested?

8        A.   Yes.

9        Q.   For what?

10       A.   DUI.

11       Q.   How long ago?

12       A.   About ten years ago.

13       Q.   And what was the outcome of that?

14       A.   Traffic violation.

15       Q.   So they dropped it to a traffic violation?

16       A.   Traffic violation, yes.

17       Q.   Okay.  Anything else?

18       A.   No.

19            MR. KUKER:  Let me just ask a question so it's

20       not misleading.  You were married, right?

21            THE WITNESS:  I was married.

22            MR. KUKER:  And you were divorced?

23            THE WITNESS:  Yes. Oh, okay.  I didn't know

24       personal stuff had to do.

25            MR. KUKER:  You asked about any other



1          litigation, so I didn't want to be misleading.

2              MS. WHITE:  That's fine.  That's fine.  We'll

3          talk about that, too.  That's fair.  I don't want

4          it to seem like you're hiding anything.

5    BY MS. WHITE:

6          Q.    So, when I asked if you've ever been involved

7    in any other litigation, you were married, correct?

8          A.    Yes.

9          Q.    And you got divorced?

10         A.    Correct.

11         Q.    So you went through the courts to get a

12   divorce?

13         A.    Yes, that's true.

14         Q.    What was your husband's name?

15         A.    Juan Carlos Dominguez.

16         Q.    How long have you been divorced?

17         A.    About 11 years.

18         Q.    Was that in Miami?

19         A.    Yes.

20         Q.    To prepare for today's deposition, what did

21   you do?  Not speaking to your attorney, I don't want to

22   know about that, but anything else to prepare for

23   today's deposition.

24         A.    Yes, I brought some receipts.

25         Q.    Did you review your files?



1          A.    Just the statements and receipts of payments.

2          Q.    **Did you do anything else?**

3          A.    No.

4          Q.    **Did you review any computer files, any**

5    **computer programs?**

6          A.    No.

7          Q.    **Is anything done electronically or is it all**

8    **done by paper in terms of keeping the records for rent?**

9          A.    I write receipts when I receive checks, money

10   orders, payments, and then it's entered on the computer.

11         Q.    **What program do you use on the computer?**

12         A.    Niu or Nexus. N-I-U.

13         Q.    **Oh, that's it, N-I-U?**

14         A.    Yeah.

15         Q.    **That's the name of the program?**

16         A.    That I use, yes.

17         Q.    **And what type of program is that?**

18         A.    I don't know.  It's by the KW program.

19         Q.    **So it's a rent management program?**

20         A.    I guess.  I think so.  I don't know.

21         Q.    **It's not like a word processing program?**

22         A.    No.

23         Q.    **Or like Excel?**

24         A.    No.

25         Q.    **That's a no.**



```
 1        A.   No, no.
 2        Q.   Did you receive the Notice of Taking
 3   Deposition Duces Tecum for today?
 4        A.   Yes, I did.
 5        Q.   And did you look at the documents requested?
 6        A.   Yes, I did.
 7        Q.   Did you bring them today?
 8        A.   I brought what I had.
 9        Q.   Okay.
10             MS. WHITE:  I'm just going to mark this as
11        Defendant's Exhibit A.
12             (Defendant's A, Notice of Taking Deposition
13             Duces Tecum, was marked for Identification.)
14   BY MS. WHITE:
15        Q.   So let's go through that and let's go through
16   the documents that you brought today.  On Exhibit A, I'm
17   flipping to the third page.  So Exhibit A is the Notice
18   of Taking Deposition Duces Tecum.  The first thing it
19   asks for is all notices that Wealthy Delight sent to Ms.
20   Shirley from when she moved into the mobile home park in
21   2003 to the present.  Do you have those documents?
22        A.   First document we sent out was a package.
23        Q.   Who is we?
24        A.   Me, myself and I. Its a package right here.
25   And we ask for signatures once they receive the package.
```



1      Q.    Okay.

2            MS. WHITE:  So, for the record, let's mark

3      this package.

4  BY MS. WHITE:

5      Q.    So the package is different from what's in

6  your hand, right?

7      A.    Correct.  That's what I would turn in and this

8  is what they sign that they received the package.

9      A.    Okay.

10           MS. WHITE:  So let's start with the package.

11           We're going to mark this as-- Exhibit B what

12      we'll refer to as the Welcome Letter.  And it is

13      actually a composite Exhibit B.

14           (Defendant's B, Welcome Letter, was marked for

15           Identification.)

16  BY MS. WHITE:

17      Q.    And correct me if I'm wrong but the Welcome

18  Package has a letter dated April 13, 2015 and has a

19  questionnaire inside an envelope, correct?

20      A.    Yes, that's correct.

21      Q.    Is this the same letter that went out to every

22  mobile home resident at Little Farm?

23      A.    Yes.

24      Q.    Did you prepare this?

25      A.    No.



1        Q.    It looks like Catalina Cruz the director of KW

2   Property Management prepared it?

3        A.    Correct

4        Q.    And this Welcome Letter lists you as the

5   assistant manager of the park?

6        A.    Correct.

7        Q.    So once you, on behalf of KW Property

8   Management, sent out these letters to all the residents

9   in the park, the letters went out and then what

10  happened?

11       A.    Well, tenants were supposed to fill it in,

12  bring me the information requested in that

13  questionnaire.

14       Q.    And when they brought you or if they brought

15  you the information, the residents signed what you were

16  referring to earlier?

17       A.    No, this is when I hand-deliver them, they

18  would sign it because we want to make sure that they

19  received the package.

20       Q.    Okay.  So the list that you were referring to

21  before was just for receipt of the package?

22       A.    Correct.

23       Q.    For delivering the package --

24       A.    Yes.

25       Q.    -- to whomever?



Debtor's Appendix in Support of her Objection to Claim                    A.35

1      A.    Correct.

2            MS. WHITE:   We're going to mark that next

3      which you were referring to before as Exhibit C.

4            (Defendant's C, List of Residents that

5            Received Welcome Letter, was marked for

6            Identification.)

7  BY MS. WHITE:

8      Q.    **Exhibit C is what you were referring to**

9  **earlier as the list of residents who received those**

10 **welcome packages?**

11     A.    Correct.

12     Q.    **Was Ms. Nelly Shirley on that list?**

13     A.    Yes.

14     Q.    **Can you point to which page it is?**

15     A.    She is right there.  I highlighted it for you.

16     Q.    **Okay.  And that would be on your list, entry**

17 **173, right?**

18     A.    Correct, with her trailer number and her

19 signature and name.

20     Q.    **Okay.  Thank you.**

21     A.    You're welcome.

22     Q.    **What else did you bring?**

23     A.    I brought the Five-Day Notice that was given

24 out to her which is my copy.  I don't know if you want

25 the original.  A statement of her rent payment.



1         Q.    Okay.

2               MS. WHITE:  And let's go ahead and mark these.

3               Before I mark this which is the Demand for

4         Rent Payment of Lot Rental Amount, this is your

5         original, correct?

6               THE WITNESS:  Yes, it is.

7               MS. WHITE:  So I'm sure you prefer that I make

8         a copy of it so we're not stamping all over it.

9               THE WITNESS:  Please.

10              (Defendant's D, Demand for Payment of Lot

11              Rental Amount, was marked for Identification.)

12   BY MS. WHITE:

13        Q.    So I'm marking as Exhibit D the Demand for

14   Payment of Lot Rental Amount.  And you can keep the

15   original.

16        A.    Thank you.

17              (Defendant's E, Rent Roll, 10-16-15, was

18              marked for Identification.)

19   BY MS. WHITE:

20        Q.    Exhibit E is the Resident Transaction Report.

21   And that's as of October 16, 2015, correct?

22        A.    Yes, it is.

23              MR. KUKER:  Is there a way to distinguish the

24        two?

25              THE WITNESS:  The dates.



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

1          MS. WHITE:  So this one was through October

2     16th, and this one actually goes through October

3     9th.

4          MR. KUKER:  So that's the old one.

5          MS. WHITE:  Let me mark this one as Exhibit F.

6          (Defendant's F, Rent Roll, 10-09-15, was

7          marked for Identification.)

8          MS. WHITE:  And now we're going to mark

9     Exhibit G which Ms. Dominguez provided us.  It is a

10     copy of the Notice of Park Closing, Change In Land

11     Use.  And we are marking as Composite Exhibit H the

12     copies of rent receipts that Ms. Dominguez provided

13     today.

14          (Defendant's G, Notice of Park Closing, Change

15          in Land Use, Defendant's H, Rent Receipts,

16          were marked for Identification.)

17 BY MS. WHITE:

18     Q.   **Are those all the documents in your file that**

19 **have to do with Ms. Shirley?**

20     A.   Yes.

21     Q.   **Is there anything else anywhere stored**

22 **electronically that would deal with Ms. Shirley's**

23 **account?**

24     A.   No.

25     Q.   **Nothing?**



1    A.    No.

2    Q.    Is the program that KW Property Management

3    uses to keep track of the rent ledger the only thing you

4    use that program for?

5    A.    Yes.

6    Q.    When did you start using that, when you

7    started working with KW?

8    A.    Actually, a little after because before KW

9    there was Biscayne Park and I had a manager so she used

10   to work for accounting.

11   Q.    So in total you have been at KW Property

12   Management for four years?

13   A.    Correct.

14   Q.    And of those four years, how long have you

15   worked at Little Farm?

16   A.    The four years.  I was hired for that

17   particular phase.

18   Q.    The entire time you have been with KW?

19   A.    Correct.

20   Q.    The prior owner which was Biscayne Park

21   Acquisition Group --

22   A.    Yes.

23   Q.    -- and what I mean by that is the prior owner

24   of Little Farm, they were the first ones that contracted

25   with KW?

Debtor's Appendix in Support of her Objection to Claim                    A.39

```
1        A.    Yes.
2        Q.    They hired you.  Who else worked in the office
3   with you?
4        A.    I had a manager, Lisette Anil.  She's no
5   longer with the company.
6        Q.    Lisette?
7        A.    Anil.
8        Q.    How do you spell that?
9        A.    A-N-I-L.
10       Q.    How long ago did she leave KW?
11       A.    I would say about a year, year-and-a-half.
12       Q.    Have you stayed in touch with her?
13       A.    No.
14       Q.    Do you have any contact information for her?
15       A.    No.
16       Q.    Do you know her phone number?
17       A.    I did before, not anymore.
18       Q.    Did she change it?
19       A.    I don't know.
20       Q.    What happened to Lisette?  Why did she stop
21   working for KW?
22       A.    I wasn't told.  I don't know.
23       Q.    Do you know if she left on her own?
24       A.    I don't know.
25       Q.    So when you were with KW and when the park was
```



1   owned by Biscayne Park, you had Lisette Anil as a

2   manager on site with you?

3       A.   Correct, on and off.  Not there 24 hours, not

4   daily.

5       Q.   How often was she there?

6       A.   She would go to the office maybe once, twice a

7   week.

8       Q.   Maybe eight to 16 hours a week?

9       A.   Probably. I don't know.

10      Q.   Did she work at other properties?

11      A.   Yes.

12      Q.   So she was kind of on loan to different

13  property managers?  She traveled around to do work for

14  different people?

15      A.   Yeah.

16      Q.   How many properties did she work at one time?

17      A.   I don't know.

18      Q.   Your position at that time was just property

19  manager?

20      A.   Assistant manager.  My title is assistant

21  manager.

22      Q.   Oh, okay.   So you're the assistant, Lisette

23  was manager?

24      A.   Yes.

25      Q.   Would she have to check in on the different



1  sites throughout the week?

2       A.   I don't know what she would do.  I would see

3  her when she will come to the property.

4       Q.   **So you just interacted with her when she was**

5  **at Little Farm?**

6       A.   Right.  Yes.

7       Q.   **What did Lisette do the days she was at Little**

8  **Farm?**

9       A.   Repeat that.

10       Q.   **What did Lisette do when she was at Little**

11  **Farm?**

12       A.   She would come, walk around, see what's going

13  on, if everything was being okay, taken care of.

14       Q.   **Did Lisette collect rents?**

15       A.   She did.

16       Q.   **Did you collect rents?**

17       A.   Yes.

18       Q.   **What else did Lisette do?**

19       A.   After my property, I don't know what she would

20  do out there.

21       Q.   **Anything else at Little Farm?**

22       A.   She would work with vendors as well. What

23  Jordan does now.

24       Q.   **And that's Enrique Jordan, correct?**

25       A.   Yes.



1    Q.   What was the difference between your job and

2  Lisette's job while she was there?

3    A.   Difference?  I would be there eight hours.  I

4  start work part-time.  I leave at 2:00 just be there

5  constantly collecting rent, finding if there are any

6  issue.  I had a maintenance guy, broken pipe, septic

7  tanks being fixed.  Just running the property, keeping

8  it clean, make sure everything is done correct.

9    Q.   When did the park get sold to Wealthy Delight?

10   A.   Sometime in February, I believe.

11   Q.   What happened to your job at that time?

12   A.   I have other properties as well.  I had

13 another property.  So I was on and off until they would

14 decide, you know, if they would sign the contract with

15 the property manager, with KW.

16   Q.   If Wealthy Delight would sign?

17   A.   Sign the contract with, correct.

18   Q.   What other properties were you at?

19   A.   Miami Lakes.  There is a condo there.

20   Q.   Do you still do work there?

21   A.   No.

22   Q.   So when KW signed a contract with Wealthy

23 Delight, that's when you ended up staying full-time?

24   A.   Contractually, yes.  Correct.

25   Q.   At Little Farm?



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

Debtor's Appendix in Support of her Objection to Claim                    A.43

1       A.   Yes.

2       Q.   And when did that happen?  When did that

3   contract get signed?

4       A.   I don't remember exactly.  They didn't go

5   through me, so I don't know.

6       Q.   Just to be clear, you are paid by KW Property

7   Management?

8       A.   Yes.

9       Q.   You don't have anything to do with the

10  contracts or negotiations or anything like that between

11  the owners of Little Farm Mobile Home Park?

12      A.   No.  Correct.

13      Q.   Who supervises you?

14      A.   Who supervise me?  That's a good question.

15  Well, I do have Catalina.  She follows up.  Calls me

16  once in a while to follow-up.

17      Q.   She is the one who signed that welcome

18  package?

19      A.   Correct.  Yes.

20      Q.   Does she oversee multiple properties?

21      A.   I'm sure she does.  I don't know.

22      Q.   You don't know what she does otherwise?

23      A.   No.

24      Q.   Do you supervise anyone at work?

25      A.   What do you mean, supervise?



1      Q.   Do you supervise any other employees or

2  contractors or anyone else that has anything to do with

3  the park?

4      A.   When they come to do work at the property,

5  yes.

6      Q.   Who they?

7      A.   The lawn service, the plumber and the

8  contractor.

9      Q.   The contractor for what?

10      A.   The contractor to do any work they need to

11  come and do.

12      Q.   You supervise the vendors that come to the

13  property and are doing the work?

14      A.   Correct.

15      Q.   Do you know Enrique Jordan?

16      A.   When Wealthy Delight signed with KW, that's

17  where I met him.

18      Q.   You didn't know him before that?

19      A.   No.

20      Q.   So on a day-to-day basis, what do you do?

21  What does your day look like?

22      A.   It all depends when I come to the park.

23  Everyday is a different thing.  I come in.  I drive

24  around, see what is going on.  Any graffiti, anything

25  broken.  Come into the office, turn on the computer.  I



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1  start answering e-mails, whatever their requests are, I

2  try to get for them.  I work on spread sheets.  I have

3  tenants coming in to pay.  I give them receipts.  They

4  report to me that this is happening, I watch out.  I

5  walk the park, see what is going on.  So, it is a

6  surprise everyday when I come to the park, yes.

7       Q.    I understand how that goes.   Right now since

8  Wealthy Delight took over Little Farm Mobile Home Park,

9  you're the only one that collects rent?

10      A.    Yes.

11      Q.    Tell me how that works.  Somebody comes in to

12  pay?

13      A.    Correct.  I receive their money order, make

14  sure it is payable to the right person and give them a

15  receipt.

16      Q.    Are the residents allowed to pay with cash?

17      A.    No.

18      Q.    Only money order?

19      A.    Money orders.

20      Q.    How long has that been?

21      A.    Since I have been working.

22      Q.    Since four years ago?

23      A.    Yes.  We did that prior with the same park and

24  we continue to do it.  We don't accept no cash.

25      Q.    You never have accepted cash?



Debtor's Appendix in Support of her Objection to Claim                    A.46

1        A.    No.

2        Q.    **Not once?**

3        A.    Not myself.

4        Q.    **Have other people accepted cash?**

5        A.    No.

6        Q.    **Did Lisette ever accept cash?**

7        A.    Not that I remember.

8        Q.    **Has there been anybody else since you have**

9   **been there who's accepted rent payments besides Lisette?**

10       A.    Are we talking about for Wealthy Delight or

11  Biscayne?

12       Q.    **Your entire time there.**

13       A.    Well, I had maintenance guys that used to work

14  there.  They used to accept money orders and they used

15  to write receipts as well.

16       Q.    **Who were those maintenance guys?**

17       A.    Robert was one of them.  Juniel was another

18  one.  I don't remember their last names.

19       Q.    **Who employed them?**

20       A.    Robert was there when I started working.  He

21  was already working there with KW.  And Juniel was hired

22  by a contractor.

23       Q.    **Which contractor?**

24       A.    Through Lisette.  I don't know.  I don't

25  remember.



1     Q.   So Lisette hired --

2     A.   The contractor, and through the contractor we

3  had that maintenance guy.

4     Q.   And the maintenance guys would accept rent

5  payments from residents?

6     A.   Money orders, yes.  They would give receipts

7  as well.

8     Q.   Do you always give receipts?

9     A.   Yes.

10     Q.   Has there ever been a time when you have not

11  given a receipt?

12     A.   Yes, when I would run out.

13     Q.   How often do you run out of receipts?

14     A.   I don't know.  Just when I run out of receipts

15  in my book, people would come and pay, I would tell them

16  I need to buy a book.  But I would also give them a

17  receipt.  If they will come back, they will come back

18  for it, I will give them a receipt.

19     Q.   Would you go and track people down to give

20  them a receipt?

21     A.   I would write it in the receipt book and if

22  they come, I will just pull it out.  When I had a

23  maintenance guy, he would go and take it to the tenants.

24  But is the question for me to go and take them the

25  receipt?  No, I would wait for them to come and get it.



1    Q.   Have you ever refused to give a  receipt to a

2  resident?

3    A.   No.

4    Q.   Before your time at Little Farm, so I guess

5  that would be just over four years ago since you have

6  been there for about four years, do you know who managed

7  the day-to-day activities of the park?

8    A.   Before the four years that I start?  I have no

9  idea.

10    Q.   When you got there, did you get an accounting

11  of rent?

12    A.   No.

13    Q.   So what happened when you got there, you had

14  nothing?

15    A.   No, I just work.  I was just front of the

16  office receiving the receipts and stuff.

17    Q.   No, no.  I mean-- Let me rephrase that.

18    A.   Yes, okay.

19    Q.   So when you got there, when you took over the

20  job or when you started in your job as assistant

21  property manager, were there any records from the

22  previous owners?

23    A.   We had files, yes.

24    Q.   What kind of files?

25    A.   I don't remember what was inside, but I know



Debtor's Appendix in Support of her Objection to Claim                    A.49

1   there were papers inside, like I believe month to month

2   agreements.

3       Q.   Like rental agreements?

4       A.   Right.

5       Q.   Contact information for people?

6       A.   I don't remember.

7       Q.   Do you remember getting an accounting of the

8   rent roll?

9       A.   No.

10      Q.   Did you get that?

11      A.   No.

12      Q.   Were you starting from scratch?

13      A.   When you say start from scratch, like for

14  what?

15      Q.   For the rent ledgers.  Were you starting from

16  nothing?  Did you have no records to start from?

17      A.   Remember, I was just an assistant.  I was just

18  there to sit, receive payments and hand-deliver it to my

19  manager.

20      Q.   Yes.

21      A.   And I didn't do anything of accounting.  I

22  didn't to anything.  I didn't have access to that.

23      Q.   Right.  That's fine.  But I'm asking about--

24  So, let me give an example.  Maybe this will make it a

25  little more clear.



1      So you get there.  You're the assistant

2  property manager.  You have your manager who's Lisette

3  who's there sometimes?

4      A.   Um-hmm.

5      Q.   You guys take over.  You get contracted by KW

6  with Biscayne Park to do the property management.  Part

7  of that is collecting rent.  So day one, you guys step

8  into the office, Welcome to Little Farm.  You get to the

9  office.  You pull files which I understand might not

10  have had much in them or you don't know what was in them

11  at this point four years later.  But were there any

12  records about balances of rent owed?

13      A.   The delinquency roll.

14      Q.   Was there a delinquency roll?

15      A.   Yes.  That's the only thing I would have.

16      Q.   Who kept the delinquency roll?

17      A.   It was printed out.

18      Q.   From where?

19      A.   From the computer.

20      Q.   From what program?

21      A.   The one that I mentioned before the Niu.

22      Q.   Niu?

23      A.   Yes.

24      Q.   So when you took over management of the park,

25  you continued using the old computer management system?



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

Debtor's Appendix in Support of her Objection to Claim                    A.51

1       A.   Yes.

2       Q.   So it wasn't like you showed up and there are

3  no records, you had no idea what anybody owes?

4       A.   No, no.

5       Q.   Did you verify any delinquency?

6       A.   Verify, meaning?

7       Q.   Did you confirm yourself that if somebody

8  showed up on the delinquency roll, did you confirm that

9  they were actually delinquent?

10       A.   With the tenant directly, you mean?

11       Q.   Right.

12       A.   No.

13       Q.   You just trusted whatever the computer printed

14  out for you?

15       A.   Yes.

16       Q.   Sorry, I didn't know the term for delinquency

17  roll.  I would have started with that had I known that's

18  what it was called.

19       A.   It's rent roll, delinquency roll.

20       Q.   Okay.  Now I know.

21       A.   That's okay.

22       Q.   Have you been involved in evictions before

23  Wealthy Delight took over?

24       A.   I did.

25       Q.   More or less how many?



1       A.   I don't remember.

2       Q.   **Over the four years?**

3       A.   Not on those four years, when I worked for the

4   commercial property.

5       Q.   **Okay.**

6       A.   You asking before or while I was working

7   there?

8       Q.   **While you worked at Little Farm.**

9       A.   I think I did one or two.

10      Q.   **Before Wealthy Delight?**

11      A.   Yes.  Now we're making it clear.

12      Q.   **Yes.**

13      A.   Thank you.

14      Q.   **No, of course.  Of course.  I think I knew**

15  **what you meant but I just wanted to clarify.**

16           **Before Wealthy Delight takes over, you did one**

17  **or two evictions.  Do you remember what those evictions**

18  **were for?**

19      A.   Nonpayment.

20      Q.   **That delinquency roll that you mentioned that**

21  **you got when you started working at Little Farm --**

22      A.   Yes.

23      Q.   **-- how many people were delinquent on their**

24  **rent when you took over?**

25      A.   Wow, that's a lot.  I don't know.



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

1       Q.   More than ten?

2       A.   Oh, yeah.

3       Q.   Twenty?

4       A.   Yes, more.

5       Q.   Thirty?

6       A.   More, more.

7       Q.   Forty?

8       A.   I would say 70 percent, 60 percent.

9       Q.   So 60 to 70 percent delinquency?

10      A.   Yes.

11      Q.   Did you work to cut down those numbers to

12  bring people current to their rent?

13      A.   I would say no.  They would receive five-day

14  notices but it was just like they didn't see anything.

15  I would give them the five-day notices to see if they

16  will come up with the money, and no.

17      Q.   Nobody paid?

18      A.   No, nobody.

19      Q.   This is before-- and just to clarify-- this is

20  before Wealthy Delight?

21      A.   Correct, yes.

22      Q.   So before Wealthy Delight takes over, you had

23  been managing it for, I guess three and a half years or

24  so.  When you first took over, it was 60 to 70 percent

25  delinquency on the rent?



Debtor's Appendix in Support of her Objection to Claim                    A.54

1      A.    Right.

2      Q.    And those numbers never went down?

3      A.    No.

4      Q.    So that whole time, 60 or 70 percent of the

5   park was delinquent with their rent?

6      A.    Yes.

7      Q.    And you sent residents five-day notices to pay

8   their rent?

9      A.    Yes.

10     Q.    But people never paid?

11     A.    Correct.

12     Q.    So why did you decide to do one or two

13  evictions?

14     A.    It wasn't up to me.

15     Q.    Who was it up to?

16     A.    My manager.

17     Q.    Lisette?

18     A.    Yes.

19     Q.    Do you know how she decided to do an eviction?

20     A.    No.

21     Q.    Or why?

22     A.    I have no idea.

23     Q.    Did you ever recommend that more evictions be

24  filed since there was such a high delinquency?

25     A.    No, I wouldn't recommend.  No, that was her



1  decision and prior owner.

2     Q.   **Biscayne Park?**

3     A.   Correct.

4     Q.   **As property manager, assistant property**

5  **manager, did you ever bring up, hey, we've got all this**

6  **delinquency.  Should we do something about it?**

7     A.   Yes, of course.

8     Q.   **And what did Lisette say?**

9     A.   I mean she would say, I know.  I know.  I

10  don't think prior owners wanted to spend money.

11     Q.   **To evict people?**

12     A.   Yes.

13     Q.   **Now that Wealthy Delight took over, are you**

14  **the one that makes the recommendation on whether or not**

15  **to file an eviction?**

16     A.   No.

17     Q.   **Who makes that decision?**

18     A.   Decision?  I was told that I needed to pass

19  out the five-day notices to whoever owes money.

20     Q.   **These five-day notices that you're talking**

21  **about, so we're going to get a little bit more specific.**

22  **Talking about the five-day notice in this case, the**

23  **demand for payment of lot rental amount that we marked**

24  **Exhibit D earlier.**

25     A.   Yes.



1       Q.    Is this a true and accurate copy of the demand

2   for payment of lot rental amount?

3       A.    Yes.

4       Q.    We're going to call it the five-day notice so

5   we don't have to say that over and over again.

6       A.    Okay.

7       Q.    Makes it a little easier.

8       A.    Okay.  That's fine.

9       Q.    So this five-day notice, did you prepare it?

10      A.    No.

11      Q.    Do you know who prepared it?

12      A.    Yes.

13      Q.    Who prepared it?

14      A.    Howard.

15      Q.    Even though Enrique Jordan, his name is typed

16  under park manager at the end?

17      A.    Yes.

18      Q.    So you got these notices?

19      A.    Yes.

20      Q.    And then what did you do?

21      A.    I went through my rent roll list delinquency

22  and I filled it out, regular mail, post it and certified

23  mail.

24      Q.    And specifically in Ms. Shirley's case, it

25  shows on the second page of Exhibit D that you posted it



1   on May 12th, correct?

2        A.   Correct.  Yes.

3        Q.   And the five-day notice is dated May 11th?

4        A.   Correct.

5        Q.   And there's a receipt that shows you sent it

6   by certified mail, like you just said?

7        A.   Yes, correct.

8        Q.   So on the first page of the five-day notice,

9   it says that you, referring to Ms. Shirley, are notified

10  that you are in default of the payment of the lot

11  payment amount for your mobile home lot.  It also states

12  that Ms. Shirley's base rent is $485, correct?

13       A.   Yes.

14       Q.   And can you walk me through the calculations

15  of what Ms. Shirley owes based on the five-day notice?

16       A.   I wanted to figure out how many months she

17  owes or skimmed.

18       Q.   Okay.  So, the notice itself though says that-

19  - Exhibit D says that Ms. Shirley did not pay rent from

20  September 2014 through May 31, 2015; is that correct?

21       A.   Correct.

22       Q.   That would be nine months?

23       A.   Correct, something like that.

24       Q.   And the five-day notice says that Ms. Shirley

25  owes $3,545?



1       A.    Yes.

2       Q.    Is that correct?

3       A.    Yes.

4       Q.    Where did you get that number from?

5       A.    My statement, my rent roll.  The statement,

6  from here.

7       Q.    So the rent roll which is Exhibit E? This is

8  where you got the numbers from for the five-day notice?

9  Exhibit D shows the balance or the total is $3,545.

10      A.    Right here.

11      Q.    So you're pointing me to Exhibit E, the second

12  page from an entry that says as of April 27, 2015,

13  according to your records, it shows a balance of $3,545?

14      A.    Correct.

15      Q.    Have you gone through and verified each one of

16  the payments and rent charges on this rent roll?

17      A.    Yes.

18      Q.    How did you do that?

19      A.    Going by the copies, the receipts that I keep

20  in my office.

21      Q.    Are copies of those receipts here today?

22      A.    Yes.

23      Q.    Are there any receipts that are not included?

24      A.    Actually, the one that I brought here today,

25  the ones that are circled I did not find receipts.  So,



1   I'm not sure if those were hers or not applicable to

2   her.

3        Q.   And you're referring to Exhibit F, right?

4        A.   Yes.

5        Q.   And the check mark on here, what does that

6   mean?

7        A.   That's a receipt that I brought.  So that they

8   are there.

9        Q.   So on Exhibit F, the purple check mark

10  represent copies of the receipts that you brought today?

11       A.   Correct.

12       Q.   And the entries that are circled?

13       A.   I don't have those receipts there.

14       Q.   They show payment --

15       A.   Right, but I'm not sure if they belong to her

16  since I didn't see the receipts.

17       Q.   So the five-day notice states that Ms. Shirley

18  did not pay rent from September 2014 through May of

19  2015, right?

20       A.   Right.

21       Q.   But there are seven payments on Exhibit F

22  since September 2014 to the present that have been

23  credited to her account, correct?

24       A.   I don't understand.

25       Q.   So, since September 1, 2014 there have been



1  one, two, three, four, five six, seven payments that

2  Wealthy Delight received from Ms. Shirley and credited

3  to her account, correct?

4      A.  Yes.

5      Q.  So a couple of questions.  It looks like-- and

6  I know you weren't there during this time back in 2010 -

7  -but it shows that on September 1, 2010 that there is

8  obviously a rent charge for the 1st of September of

9  2010. And then it shows August rent, the next entry

10 under that says August rent payment, and then it says

11 payment, payment, correct, going down the line?

12     A.  Yes.

13     Q.  Does it look like she was double-charged for

14 that?

15     A.  I don't know.

16     Q.  You have no idea?

17     A.  I don't know.

18     Q.  Because it shows rent November-- and I'm sorry

19 I know you weren't here during this time.

20     A.  That's okay.

21     Q.  I feel you're more of an expert of the rent

22 ledgers than me, so I'm trying get your opinion.

23 September 1, 2010 says rent.

24     A.  Yes.

25     Q.  $485 was the amount.



1    A.    Yes.

2    Q.    Charged to her account balance of $485.  And

3  then the next entry says September 7, 2010, August rent

4  payment, but there is also another charge to her account

5  of $485.  So now she has a balance of $970.

6    A.    Yes.

7    Q.    That's correct?

8    A.    Yes.  I'm reading it just like you are.

9    Q.    Right, I'm not asking you.

10    A.    No, yeah.  That is correct.

11    Q.    Does that look like it is wrong?

12    A.    I don't know.

13    Q.    You don't know?

14    A.    No.  She has two payments, so she did the

15  payments.

16    Q.    There was one for $145, one is $300.

17    A.    Yeah.

18    Q.    But it looks like there are actually two rent

19  charges for September, correct?  And one of those

20  charges is listed as an August rent payment, correct?  I

21  know you didn't do it.

22    A.    Yeah. I didn't work there in 2010.

23    Q.    I want to go through with you the receipts,

24  the copy of the receipts that you brought as Composite

25  Exhibit H.  And if I'm correct, this looks like a copy



877.291.3376
www.UCRinc.com

1    of the rent receipts book and then you circled the

2    entries for Ms. Shirley, right?

3         A.   Correct, yes.

4         Q.   Okay.  Would you ever initial money orders

5    like the bottom part of money orders for people?

6         A.   Yes, I did.

7         Q.   So if you didn't give them a receipt,

8    sometimes you would?

9         A.   That's what I would sign, yes.

10        Q.   So August 6, 2012 I'm referring to Composite H

11   again, there is a receipt for $250 that Ms. Shirley

12   paid, right?

13        A.   Correct.

14        Q.   Is that when you took over managing the park

15   or were you there before that?

16        A.   When was this?

17        Q.   August 6, 2012.

18        A.   I was there.  I wrote the receipt.

19        Q.   Were you there before that, though?

20        A.   I started in, what, four years ago.  I started

21   in 2011, yes.

22        Q.   So you don't have any receipts for 2011 or

23   further back?

24        A.   What I did, I brought copies of the receipts

25   where she start lacking off, because up to there, she



1  was fine with her rent.

2      Q.   So you only have receipts, you only brought

3  receipts today from August 6, 2012 forward?

4      A.   Correct.

5      Q.   But there are more receipts in the office?

6      A.   I would have to look for the books.

7      Q.   But you think there are more receipts?

8      A.   Yes.

9      Q.   So August 6, 2012 payment that shows up on the

10 rent ledger.  Next one you have is September 18, 2012?

11     A.   Yes.

12     Q.   That shows up for $350.  What does that say?

13     A.   8440.  How we do it, we enter the last six

14 numbers on-- Those are the numbers from the money

15 orders.

16     Q.   Okay?  And the date of this 09-27-12?

17     A.   Yes.

18     Q.   For $370.  Okay.  That shows up.  The next

19 receipt is for October 4, 2012 for $420?

20     A.   Yes, receipt number 7553

21     Q.   So on your receipt it says that there is a

22 zero balance due, correct?

23     A.   Yeah.  I didn't go, I didn't look through the

24 computer.  So it's just like giving her the receipt that

25 I received that amount.



Debtor's Appendix in Support of her Objection to Claim          A.64

1     Q.   But on the receipts prior, you put zero

2  balance as well.

3     A.   I know.

4     Q.   And the October 4, 2012 receipt shows a zero

5  balance?

6     A.   Right, but it is incorrect.

7     Q.   So at the time you put together this receipt,

8  that was incorrect?  The balance due was incorrect?

9     A.   Yes.

10     Q.   Because you went and looked at your rent roll?

11     A.   Right. Yes.

12     Q.   The next rent receipt is November 19, 2012,

13  right?

14     A.   Yes.

15     Q.   And it was for $440, right?

16     A.   Yes.

17     Q.   And here you show a balance on the receipt for

18  $45, right?

19     A.   Right.

20     Q.   On the rent ledger, it shows $110 balance?

21     A.   Right.

22     Q.   Why?

23     A.   Because I must have not looked at the

24  computer. A lot of times, we didn't have our rent roll

25  updated in my computer so I had a lot of issue problems



1   with that.

2       Q.   A lot of errors came up in the accounting

3   because of that?

4       A.   I don't do accounting.

5       Q.   Well, I don't mean accounting like sitting

6   down and crunch the numbers and prepare taxes, but

7   accounting in terms of keeping the rent roll accurate

8   and the receipts accurate.

9       A.   I don't do that part either.

10      Q.   So at the time --

11      A.   I would only bring her name up and what would

12  show is what I would write at that time.

13      Q.   So when you would write these receipts that

14  we're referring to, you would pull up whatever was on

15  the rent roll on the computer?

16      A.   Yes.

17      Q.   And that's how you would calculate the balance

18  due?

19      A.   More or less, yes.

20      Q.   And you agree that there are some issues

21  because the receipt is not correct?

22      A.   Right.  Yes.

23      Q.   For January 11, 2013, there is a payment of

24  $485?

25      A.   Yes.



1       Q.    It looks like the balances match up on this

2    one according to you?

3       A.    Yes.  Some of them are not gonna match.

4       Q.    And some of them are not?

5       A.    Yes.

6       Q.    For 02-07-13, a payment of $500.

7       A.    Uh-huh.

8       Q.    For 03-11-13, a payment of $500.  For 10-13,

9    $500, correct?

10      A.    Yes.

11      Q.    05-08-13, is that $485?

12      A.    Yes.

13      Q.    Same thing for June 6, 2013?

14      A.    Correct.

15      Q.    July 12, 2013, $485?

16      A.    Yes.

17      Q.    September 1, 2013, $500?

18      A.    Yes.

19      Q.    October 9, 2013, $500?

20      A.    Correct.

21      Q.    11-12-13, it shows $500?

22      A.    Yes.

23      Q.    For December 6, 2013, I see you made a

24    notation?

25      A.    Yes, correct.



1        Q.    **What does that mean?**

2        A.    Because it just happened that I wrote on a

3   different date for the same money order number, but she

4   got credit for a payment.  So that's why I wrote that

5   money order number on this one.

6        Q.    **Okay.**

7        A.    I don't know why I wrote the same money order

8   for two different months.

9        Q.    **For which two months?**

10       A.    You see here, you see 2064.  I wrote the name

11  money order number but she came different months to pay.

12  She did get credit for that.  That's why I put this

13  number against my list.

14       Q.    **Well, the November 12, 2013 payment, I see it**

15  **credited for $500.  Well, actually I don't see that.**

16  **Oh, wait.  It's down here.  It was entered 01-29-13.**

17  **This was entered even though the receipt is 11-12-13,**

18  **right?**

19       A.    Right.  Yeah, that's the same.

20       Q.    **And then the 12-06-13, you list the same?**

21       A.    For the same money order, but she got credit

22  for the payment that she did that day, which I'm

23  assuming is this money number.

24       Q.    **Okay.  And that number you said you assume**

25  **that's the 17479?**

1    A.   Right.

2    Q.   **February 3, 2014, $500?**

3    A.   Yes.

4    Q.   **March 11, 2014, $300.**

5    A.   Right.  She brought two money orders.

6    Q.   **April 8, 2014, $500?**

7    A.   Yes.

8    Q.   **This looks like an original?**

9    A.   Yes.  I saw it in her file so I put it there

10   because it is entered.

11   Q.   **Okay.  It does show up?**

12   A.   Yes.

13   Q.   **So there's two payments for June 2014, one for**

14   **$485 and for $50.   And you don't have--**

15   A.   I didn't find the the receipt, so I need to

16   look for that receipt to see.  I don't know if it

17   belongs to her or it doesn't.

18   Q.   **Okay.  July 9, 2014 is a payment of $485.**

19   **September 15, 2014, a payment of $550 was accepted,**

20   **right?**

21   A.   Yes.

22   Q.   **And this is January 12, 2015, right?**

23   A.   Correct.

24   Q.   **A payment of $600.**

25   A.   Correct.  She brought two money orders there.



1      Q.   Okay.

2      A.   I didn't see this number in my list and I need

3 to check, I need to look for it.

4      Q.   So what we're referring to is the receipt

5 number 305579?

6      A.   This one here.  We don't go by this number.

7      Q.   Well, I'm just saying it for the record.

8      A.   Oh, sorry.

9      Q.   No, I hear you. I know what you're saying.

10 But just so that we know what we're looking at.  It's

11 the February 24, 2015 receipt for $500.  And your note

12 here says credit.  Sorry I can't read that.  Credited

13 to?

14      A.   Oh, it was credited to Hector Brown.  In other

15 words, I have to remove it from his account and put it

16 to her account.  But I also need to check those circle

17 ones who I credit it to.  Because the ones that are

18 circled, if I don't find a receipt, she might owe that

19 money.

20      Q.   Okay? But is this for sure, this February

21 24th --

22      A.   Yes, I need to credit her for one month.

23      Q.   -- 2015 was not credited to Ms. Shirley's

24 account?

25      A.   Correct.  I found it was in his account today.



1  I saw that today.

2      Q.   April 6, 2015, there were two money orders for

3  a total of $600?

4      A.   Yes, correct.

5      Q.   The February 24, 2015 receipt shows a balance

6  due but the April --

7      A.   I didn't write in totals because I wasn't in

8  front of the computer so I told her I would write her a

9  receipt that I receiving the money order.

10     Q.   But there is no balance due written in?

11     A.   Yeah, I left it in blank.  I wasn't sure of a

12  total.

13          MS. WHITE:  I'm going to take a minute to look

14      through some of the records that I have.  Do you

15      guys want to take a break?

16          (Break taken. )

17          MS. WHITE:  Let's go back on the record.

18  BY MS. WHITE:

19     Q.   So this rent ledger goes through 10-16-15

20  right, at least that's the date of the top?  Or, I'm

21  sorry, 10-09-15.

22     A.   Yes.

23     Q.   When did you stop accepting rent from Ms.

24  Shirley?

25     A.   I never did stop receiving payments from her.



1  Well, what was the question again before I answer?

2     Q.   No, that's okay.  It's not a trick question.

3  When did you stop accepting rent payments from Ms.

4  Shirley?

5     A.   I never stopped receiving payments from her.

6  Just when she came and pay, I told her that I couldn't

7  accept.  Let me see if I remember.  Because she-- I had

8  served her already with the five-day notice and regular

9  payments-- She would have to pay the full amount in

10  order for me to accept her payment.  If not, she would

11  need to go to court to pay the payments.

12     Q.   Okay.  So you're saying that as soon as you

13  sent out the five-day notice to Ms. Shirley, that's when

14  you stopped accepting any partial rent payments?

15     A.   No.  No, because if she comes and pay me the

16  amount that was showing in the five-day notice, then I

17  would I could accept that money.

18     Q.   Okay.  But if it were less than that, you

19  could not?

20     A.   Correct.

21     Q.   So, so starting in May is it fair to say that

22  starting in May, since the five-day notice was dated May

23  1, 2015, starting then is when you were accepting either

24  what was written in the five-day notice or --

25     A.   She had like ten days to come back to pay the

1  full amount.  After that then I would let her know that

2  I couldn't accept partial payments but she would need to

3  go to court and do the payments over there.

4      **Q.   Did Ms. Shriley try to pay any money after you**

5  **sent her the five-day notice?**

6      A.   I don't remember.

7      **Q.   You don't remember at all?**

8      A.   No.

9      **Q.   In May or June or July?**

10     A.   I don't remember.

11     **Q.   You don't remember?**

12     A.   No, I don't remember.

13     **Q.   I'm handing you a copy of what I'm going to**

14 **mark as Exhibit I.  Mr. Kuker, here's a copy.**

15          (Defendant's I, Receipt, was marked for

16          Identification.)

17 BY MS. WHITE:

18     **Q.   What I just handed you that is marked as**

19 **Exhibit I is a money order 17018177286 and it is for**

20 **$485, the stub of a money order.**

21     A.   Yes.

22     **Q.   And at the top there's handwriting that says**

23 **Addys 5-16-14 and it looks like a signature?**

24     A.   Correct.  That's my signature.

25     **Q.   That's your signature?**



1      A.   Yes.

2      Q.   Is this credited on the ledger?

3      A.   I don't see it.

4      Q.   Is it something that should be added to the

5  ledger?

6      A.   Yes, of course.

7      Q.   We previously discussed that receipt from

8  February 24, 2015 but I just want to mark it

9  individually as Exhibit J.

10          (Defendant's J, Receipt dated 02-24-15, was

11          marked for Identification.)

12  BY MS. WHITE:

13      Q.   And this is the one that we previously

14  discussed as not being credited on the rent ledger

15  either, correct?

16      A.   Okay.  Yes.  You mean the one we have here?

17      Q.   Right.  You had a copy, and correct me if I'm

18  wrong, I believe you had a copy of the February 24, 2015

19  receipt in your records, and it just wasn't on the

20  ledger.

21      A.   Okay.

22      Q.   Is that correct?

23      A.   Let me check.

24      Q.   Take your time.

25      A.   Yes, that's correct.



1     Q.    Okay.  And that should be credited to Ms.

2  Shirley?

3     A.    To her account, correct.

4     Q.    Thank you very much.

5     A.    You're welcome.

6     Q.    I'll now show you what I marked as Exhibit K.

7           (Defendant's K, Money Order Dated 02-16-15 to

8           Biscayne Park, was marked for Identification.)

9  BY MS. WHITE:

10    Q.    This is a copy of a money order made payable

11 to Biscayne Park from February 16, 2015 for $500.  The

12 last four digits of the money order are 5135.  And I

13 don't see that this shows up on the rent ledger either,

14 correct?

15    A.    When was this?

16    Q.    This was February 16, 2015, the money order

17 that Ms. Nelly Shirley signed and made payable to

18 Biscayne Park, and it's a copy of the entire money

19 order.

20    A.    Okay. All right.

21    Q.    Is that credited on the rent ledger?

22    A.    It's not here, no.

23    Q.    I'm marking as Exhibit L what I'm handing you

24 now.

25           (Defendant's L, Receipt Dated 09-06-10, was



```
 1              marked for Identification.)

 2   BY MS. WHITE:

 3       Q.   So what I just handed you-- and let me start

 4   by saying I know this is before your time --

 5       A.   I know.

 6       Q.   So it is what it is.  It's before your time.

 7       A.   Okay.

 8       Q.   But it is a receipt --

 9       A.   Correct.

10       Q.   -- dated September 6, 2010.  Receipt number

11   102087.  And it is a receipt for a money order that Ms.

12   Shirley paid money for?

13       A.   Yes.

14       Q.   And in the notation, it says, for rent.

15       A.   Yes.

16       Q.   August and September --

17       A.   Yes.

18       Q.   -- of 2010.

19       A.   Yes.

20       Q.   For a total again of $785.

21       A.   Right.

22       Q.   Does that show up in the rent ledger?

23       A.   Well, as I can see here, if you total these

24   two payments that she did in September 7th, it was

25   entered as $785. The 9797?
```



1       Q.    Oh, okay.

2       A.    That totals to that, to this receipt.

3       Q.    Okay.

4       A.    So that's in there.

5       Q.    Okay.

6       A.    It was entered the following day she made the

7  payment.

8       Q.    Okay.

9       A.    That probably applies to those $785.

10      Q.    That's that one.  Since it doesn't look like

11 they put in the receipt numbers.

12      A.    Well, they did use some numbers but towards

13 what, I don't know.

14      Q.    We don't know.

15      A.    Probably to the money orders, but they didn't-

16 - when they wrote the receipt, they didn't write it.

17      Q.    Correct.  Okay.  At the bottom of that

18 receipt, though, the 09-06-10 receipt, it says that

19 there is a balance of $185?

20      A.    Yes.

21      Q.    Do you know what that would be for?

22      A.    Well, if you look at it when she made the

23 payment it leaves a balance of $185.

24      Q.    Okay.  Okay.

25      A.    Okay.



Debtor's Appendix in Support of her Objection to Claim        A.77

1    Q.   Is it possible that there are other rent

2  payments out there for receipts that may not have been

3  credited other than the ones we discussed today?

4    A.   I don't think so.  I don't know.

5    Q.   Do you know that for sure?

6    A.   I don't know.

7    Q.   Is it possible since some were left out today

8  for purposes of today, do you think there may be others?

9    A.   I don't know.  I need to check my rent roll.

10  And like I said, the ones that are circled, I'm gonna

11  make sure they're hers.  If not, I'm going to have to

12  credit it back to her account.

13    Q.   Right.  So, in short, there are some issues

14  with the numbers?

15    A.   Yes.

16    Q.   With the numbers that Wealthy Delight claims

17  that Ms. Shirley owes for rent?

18    A.   In a few dollar amounts, yes.

19    Q.   So I want to talk a little bit about Ms.

20  Shirley.

21    A.   Uh-huh.

22    Q.   You know Ms. Shirley personally, correct?

23    A.   Yes.

24    Q.   She is in this room today?

25    A.   Yes.



1        Q.   How do you know Ms. Shirley?

2        A.   I started knowing her when she started coming

3   to pay and we became friends.

4        Q.   Because Ms. Shirley lives in the park that

5   you're managing?

6        A.   Right.

7        Q.   It's not a trick question.  Just how you know

8   her.

9        A.   She's very nice.  We get along good.

10       Q.   Oh, good.  How long has Ms. Shirley lived at

11   Little Farm Mobile Home Park?

12       A.   I wouldn't know.  I know her for the four

13   years that I have been working there.  I mean, I go by

14   what she says.

15       Q.   What has she told you?

16       A.   I don't know.  She has been there for a very

17   long time.

18       Q.   Before you got there --

19       A.   Yes.

20       Q.   -- Ms. Shirley was living there?

21       A.   Yes, um-hmm.

22       Q.   Did Ms. Shirley ever have a written lease with

23   Wealthy Delight or Biscayne Park?

24       A.   I don't know because I never look into her

25   file, so I don't know.  I mean, when I started working



Debtor's Appendix in Support of her Objection to Claim                    A.79

1  there, we did have papers inside files, but they were

2  stolen three times.

3      Q.   Oh, my gosh.

4      A.   Yes.

5      Q.   Can you talk about that?

6      A.   Can I talk?

7      Q.   What happened?

8      A.   Nothing, we got broke in in the trailer.

9      Q.   So, I know you know and you know that I know

10  but for the record, how is the management office set up?

11  It's on site at the mobile home park, right?

12     A.   Correct.

13     Q.   It's in a trailer at the back corner of the

14  park?

15     A.   Yes.

16     Q.   More or less?

17     A.   You can say yes.

18     Q.   That's how I visualize it.  Is that correct?

19     A.   Well, if you look at it through the two

20  entrances, I'm right in the middle.  Yeah.

21     Q.   The roads kind of intersect?

22     A.   Correct.

23     Q.   And the rent office and mailboxes are all in

24  that corner?

25     A.   Yes.



1      Q.    And that is A-154 you said, right?

2      A.    A-154, yes. The lot number.

3      Q.    When was the first time the place got broken

4  into?

5      A.    I don't remember.  I think it was 2000-- It

6  was in December three times on the same month.  I don't

7  remember if was '11 or 2012.

8      Q.    Three times in the same month?

9      A.    Yes.

10      Q.    Oh, I thought we were talking different years.

11      A.    Oh, No, no, no.  It was done in the same

12  month.

13      Q.    Oh.  So, either 2011 or '12?

14      A.    Um-hmm.

15      Q.    What happened, somebody broke in?

16      A.    Yes.

17      Q.    Did that individual or group of people, did

18  they steal anything?

19      A.    I don't know. Group of people, I can't say.  I

20  wasn't there.

21      Q.    Thank goodness.

22      A.    I know.

23      Q.    Whoever it was, did they take anything?

24      A.    Yes.

25      Q.    What did they take?



1      A.    Files.

2      Q.    What did they take? Resident files.

3      A.    Yes.

4      Q.    Were there copies of those files anywhere?

5      A.    No.

6      Q.    Those were the originals?

7      A.    Yes.

8      Q.    So if somebody's file, and I'll just use Ms.

9  Shirley as an example, if it was Ms. Shirley's file in

10  the drawer in the rent office, and we'll just say they,

11  they took all of the original files out of the rent

12  office?

13      A.    Um-hmm, yes.

14      Q.    What was in those files by the time you were

15  working there?

16      A.    I don't know.  I didn't get much time to go

17  through them.

18      Q.    You think it was in 2011 then if you hadn't

19  had time to go through them?

20      A.    I don't remember.  I don't remember.

21      Q.    So when did the break-ins happen during the

22  month, one day after the other?

23      A.    A week.

24      Q.    A week apart, each one?

25      A.    Yes, more or less.



1       Q.   Was it at night?

2       A.   Yes.

3       Q.   Do you remember what day of the week?

4       A.   No.

5       Q.   How did you find out about the break-ins?

6       A.   When I came in, I saw the mess.

7       Q.   Did you call the police?

8       A.   Yes.

9       Q.   Did you put together a report?

10      A.   Yes.

11      Q.   Did you report that the files were stolen?

12      A.   Yes.

13      Q.   They were probably looking for money orders,

14  right?

15      A.   No.

16      Q.   No?

17      A.   No. As a matter of fact, they left money

18  orders.  Because once I receive a money order, right

19  away I put the name who it's payable to.

20      Q.   Right.

21      A.   So they can't do anything with those money

22  orders.

23      Q.   Oh, I see.  So there were actually money

24  orders in the office?

25      A.   I don't remember, but, you know, probably they



1  had maybe a few scattered around.  But, no, they didn't

2  steal any money orders.

3      **Q.    Is it possible that some of the money orders**

4  **were stolen?**

5      A.    No.

6      **Q.    Why not?**

7      A.    They were in the drawers scattered, a few

8  there.

9      **Q.    What do you mean?**

10     A.    I had a few in my drawer and they were there.

11     **Q.    Oh, I see.**

12     A.    Yes.

13     **Q.    But resident information was stolen?**

14     A.    Probably. Mines was stolen.

15     **Q.    You had information in there?**

16     A.    Yes.

17     **Q.    What do you have in there?**

18     A.    My file with my application with all the

19  information in it.

20     **Q.    Oh, your application to work for KW?**

21     A.    Yes.

22     **Q.    Did you have like identify theft issues after**

23  **that?**

24     A.    Yes, I did.

25     **Q.    Each time they broke in, were more things**



1  stolen?

2       A.   Yes.

3       Q.   So the first time they went in, they took a

4  bunch of files.  Second time, same thing and third time,

5  same thing?  They couldn't just take all the files at

6  once.

7       A.   There were plenty.

8       Q.   Oh, there were a lot of files?

9       A.   Yes.

10      Q.   About how many files?

11      A.   I don't know.  I didn't count.

12      Q.   Like a whole filing cabinet?

13      A.   Yes.

14      Q.   Like five draws tall?

15      A.   Five, yeah, but not all of them.  I mean I

16  probably have two drawers full.

17      Q.   And did KW Property Management do anything

18  about that other than call the police and make a report?

19      A.   There's nothing I think we could have done.

20      Q.   Just an incident report?

21      A.   Correct.

22      Q.   Did you notify the residents that there was a

23  break-in?

24      A.   I did.  And I request again the information.

25  But most of them didn't bring them because they were



1  afraid things would happen again, of course.  And that

2  stayed like that.

3      Q.   Did you tell the residents in writing what had

4  happened or just verbally?

5      A.   No, verbally, yes.

6      Q.   I just want to clarify a couple of things

7  about who put the information into those rent roles.

8  When you were working with Lisette back when Biscayne

9  Park owned the mobile home park.

10      A.   Yes.

11      Q.   Lisette always did the entries?

12      A.   At the beginning, yes.

13      Q.   When did you start doing them?

14      A.   I don't remember.  On and off.  Sometimes she

15  would just come pick up the rents the checks and she

16  would enter it in in her office.

17      Q.   So at the beginning it was Lisette then on and

18  off, you started doing it?

19      A.   Yes.

20      Q.   Then of course once Wealthy Delight bought it,

21  you alone did it?

22      A.   Yes.

23      Q.   And still do it?

24      A.   Yes.  I'm still there.

25      Q.   Have you had a chance to review the Complaint



1  for Eviction that Wealthy Delight filed against Ms.

2  Shirley?

3       A.   What do you mean?

4       Q.   So I know you know about the five-day notice?

5       A.   Right.

6       Q.   Have you had a chance to read the entire

7  Complaint that was filed with the court?

8       A.   No.

9       Q.   Are you familiar with the rules and

10  regulations of the park?

11       A.   More or less, but not too sure.

12       Q.   Not in great detail?

13       A.   Uh-huh.

14       Q.   What are some of the basic rules, like off the

15  top of your head?

16       A.   Wow.

17       Q.   Pay your rent? Right?

18       A.   You know, I don't even know if that's in the

19  rules or regulations.  I don't know.  Everybody has to

20  know they have to pay rent.  But their garbage needs to

21  be picked up, parking, how they park.

22       Q.   Dogs and things like that?

23       A.   They have to be on a leash.

24       Q.   I'm giving you what we're marking as Exhibit

25  M. This is just a copy of what was attached to the



1   Complaint as Exhibit B that we're marking as Exhibit M.

2   It is a prospectus, part of a prospectus for Little Farm

3   Mobile Home Park and the rules, part of the rules and

4   regulations on the very last page.

5             (Defendant's M, Prospectus for Little Farm

6             Mobile Home Park, was marked for

7             Identification.)

8   BY MS. WHITE:

9       Q.   Have you have seen these?

10      A.   No.

11      Q.   So I just want to point your attention to

12  paragraph 11, the rules and regulations.  It is pretty

13  clear.  I think you would agree it says, "Little Farm

14  may evict a tenant for nonpayment of rent, violation of

15  federal, state or local ordinances.  Change in use,

16  violation of any rules established by the park," which

17  these rules.  And that, "if the park determines that the

18  mobile home owner is to be evicted for violating a rule

19  or regulation, the owner will deliver a written notice

20  of the grounds upon which the mobile home owner is to be

21  evicted as least 30 days prior to the time the mobile

22  home owner is to vacate the premises." Is that correct?

23      A.   I don't know because I never --

24      Q.   You've never seen this at all?

25      A.   No, you asked me.  Never seen this, never.



1      Q.   Okay.  That's fine.  If you haven't, you

2  haven't.

3      A.   Of course.

4      Q.   All right.  How would you describe your

5  relationship with Ms. Shirley?

6      A.   At this point?

7      Q.   Yeah.

8      A.   We've been friends.  I mean, she comes.  We

9  talk.  Friendly.

10     Q.   Do you consider yourself friends with her

11 outside of work?

12     A.   Sure. Yes.

13     Q.   Did you ever at any point tell Ms. Shirley to

14 not pay her rent?

15     A.   No.

16     Q.   Have you ever told any other residents at

17 Little Farm Mobile Home Park not to pay their rent?

18     A.   No.

19     Q.   Did you ever tell any other residents to save

20 their rent because the park would be closing?

21     A.   No.

22     Q.   Have you ever told any of the residents that

23 they should just hurry up and move elsewhere?

24     A.   No.

25     Q.   Have you ever given any residents a list of



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1  housing resources to move elsewhere?

2        A.   Yes.

3        Q.   Is this what you're giving residents?

4        A.   Yes.

5        Q.   I'm marking that as Exhibit N.

6             (Defendant's N, Community Action Brochures,

7             was marked for Identification.)

8  BY MS. WHITE:

9        Q.   So you were giving residents it's called,

10  looks like it's called, the front page says Community

11  Action, Human Services Department.

12        A.   There's different.

13        Q.   Oh, I see.  There's different handouts?

14        A.   Yes.  Attached to each one.

15        Q.   Of different housing resources?

16        A.   Yes.

17        Q.   You've never told any residents at the park

18  that it would be better for them to move elsewhere at

19  all for any reason?

20        A.   What do you mean?

21        Q.   Have you ever had a conversation with any of

22  the residents telling them that it would be better for

23  them to move?

24        A.   No.

25        Q.   There's nobody in the park that you've told to



1  save their rent and not pay their rent?

2       A.   To save their rent?

3       Q.   Right.

4       A.   No.

5       Q.   Never?

6       A.   No.

7       Q.   Are you aware that a lot of the residents are

8  claiming that you're telling them to save the rent and

9  not pay it?

10      A.   Yes. I have heard, yes.  You hear everything

11 that happens there.

12      Q.   I'm sure.

13      A.   Yes.

14      Q.   Why would so many people be saying that?

15      A.   I don't know.

16      Q.   Could it be something that they

17 misinterpreted?

18      A.   I have advise her.  She come up to me to ask

19 me what could she do, like as an advice.  But I don't

20 tell people what to do.

21      Q.   Well, and by she, you mean Ms. Shirley?

22      A.   Ms. Shirley, I'm referring to her, yes.

23      Q.   What advice have you given Ms. Shirley?

24      A.   The advice that I gave her was that if she

25 owed that money, she could probably go someplace else



1  with that amount of money because the park was going to

2  close anyway in the future.  As a friendly advice.  I

3  told her that's what I would do.  I didn't even tell her

4  to do it.

5      Q.   Okay.  Did you give that advice to other

6  residents in the park as well?

7      A.   I don't remember.

8      Q.   Is it possible that you have?

9      A.   Maybe one person or two but that's about it.

10     Q.   Do you know who those people are?

11     A.   I could say Roberto from C-310.  He also asked

12  for advice.  And that's it that I remember.

13     Q.   Did you give Roberto the same advice?

14     A.   Yes.

15     Q.   Have you had any bad interaction with Ms.

16  Shirley recently?

17     A.   No.

18     Q.   Not at all?

19     A.   No.

20     Q.   In the four years you have been working there,

21  have you ever had any bad interactions with her?

22     A.   No.

23     Q.   Have you spoken to Ms. Shirley about this

24  case?

25     A.   About the case that were having today?



1      Q.   Yes, the eviction?

2      A.   Yes.

3      Q.   And what did you and Ms. Shirley talk about?

4      A.   I had went to ask her that we were coming here

5   to discuss what we were having this meeting today, and I

6   don't remember how we started with the conversation.

7   Maybe she remembers.

8      Q.   Well, she can't say.  Nobody can help you.  I

9   know it's a weird setting because we're having a

10  conversation?

11     A.   I went to ask her. I just remember I went to

12  ask her what was going on that we have to come to this

13  meeting.  So her reply to me was that she thought it was

14  to negotiate or for a settlement actually because she

15  knows she owes the money, and she wanted to see if

16  whatever she was entitled to get, we would deduct what

17  she owed and she will pay the difference.  That's the

18  only thing that we discussed about.

19     Q.   Did you tell Ms. Shirley that if we had to

20  come to the deposition today that she would probably

21  have to be out in 24 hours?

22     A.   No.

23     Q.   Have you asked Ms. Shirley to sign anything

24  since Wealthy Delight took over ownership of the park?

25     A.   No.  Well, her signature when I passed out

1   those packages.

2        Q.   Right.  Aside from that?

3        A.   No.

4        Q.   Have you been telling Ms. Shirley or any other

5   residents that Legal Services is giving them bad

6   information or that they're lying to the residents?

7        A.   No.

8        Q.   Do you recall the interaction with Ms. Shirley

9   where she sold you to two sets of hair extensions?

10       A.   Yes.

11       Q.   What happened?

12       A.   She sold them to me.

13       Q.   How much?

14       A.   She wanted two hundred.  I didn't have it.

15   Actually, she wanted to pay her FP&L, and I gave her

16   $100 for it and she took it because she needed to pay

17   her--  I really didn't even need it.  I did it to help

18   her out because the extensions are brown.  I still have

19   them.

20       Q.   You still have them?

21       A.   Yeah, they're still there.

22       Q.   So Ms. Shirley asked you for $200 for the hair

23   extensions?

24       A.   Yes.

25       Q.   And you ended up --



1      A.   Giving her $100 to help her so she could pay I

2  think it was her FP&L or something.  I didn't even

3  really need them so I just did it to help her out

4  actually.

5      Q.   How long did you take to pay the money to Ms.

6  Shirley?

7      A.   I think two weeks. I didn't have it when she

8  was asking for it, and I told her.

9      Q.   Do you recall Ms. Shirley calling the police

10  about a year or two ago about pit bulls in the park?

11      A.   I don't remember.

12      Q.   There was a man who was living there who had

13  pit bulls?

14      A.   I don't know.

15      Q.   Have you ever dated any of the residents?

16      A.   No.

17      Q.   Are there rumors that you have?

18      A.   I have no idea.  I never heard of it if there

19  were.

20      Q.   Have you and Ms. Shirley ever had any

21  altercations, verbal altercations?

22      A.   Never.

23      Q.   Never any negative interactions?

24      A.   No, I don't think so.  I don't remember.  I

25  done think so.



Debtor's Appendix in Support of her Objection to Claim                        A.95

1      Q.    That's a no?

2      A.    No.

3      Q.    Is there anything else that you want to bring

4  up that we haven't brought up today?  Anything?

5      A.    No. I think you're very questionable with your

6  questions.

7      Q.    Anything else at all you want to mention or

8  clarify?

9      A.    No.

10      Q.    Nothing at all?

11      A.    No.

12      Q.    There is nothing else you can do to refresh

13  your memory for the things you didn't know or could not

14  remember?

15      A.    No.

16      Q.    Anything else?

17      A.    No.

18          MS. WHITE:  Okay.  I have no further

19          questions.

20          MR. KUKER:  I have no questions.

21          Were you listening when I explain to Enrique

22          about your right to waive reading of the

23          transcript?

24          You have the right, if this is ordered, to

25          read it.



1           You can't change it.  You can add on an errata

2      sheet saying, I said this, not that.  You have the

3      right to waive the right to do that.  You'd have to

4      go to her office.

5           THE WITNESS:  To read everything I said?

6           MR. KUKER:  Yes.

7           THE WITNESS:  Yeah, well, I think I said

8      everything right.

9           MR. KUKER:  Well, the question is not what you

10     said, the question is did she transcribe what you

11     said correctly.

12          THE WITNESS:  I'm okay.

13          MR. KUKER:  You waive?

14          THE WITNESS:  I'm okay.  I waive.

15          (Deposition concluded at 3:30 p.m.)

16

17

18

19

20

21

22

23

24

25



Debtor's Appendix in Support of her Objection to Claim                    A.97

```
1                    CERTIFICATE OF OATH

2    THE STATE OF FLORIDA    )

3    COUNTY OF BROWARD       )

4

5        I, Victoria Aiello Miller, the undersigned

6    authority, certify that ADDYS DOMINGUEZ personally

7    appeared before me and was duly sworn.

8        Witness my hand and official seal this 21st day of

9    October, 2015.

10

11

12

13

14    _____
      VICTORIA AIELLO MILLER, Court Reporter
15    NOTARY PUBLIC - STATE OF FLORIDA
      Commission No:  FF100154 DD
16    Commission Exp: March 10, 2018

17

18

19

20

21

22

23

24

25
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1                    CERTIFICATE OF REPORTER

2     STATE OF FLORIDA

3     COUNTY OF BROWARD

4

5          I, VICTORIA AIELLO MILLER, Court Reporter and

6     Notary Public for the State of Florida, do hereby

7     certify that I was authorized to and did

8     stenographically report and transcribe the foregoing

9     Deposition, and that the transcript is a true and

10    complete record of my stenographic notes.

11         I further certify that I am not a relative,

12    employee, attorney or counsel of any of the parties, nor

13    am I a relative or employee of any of the parties'

14    attorney or counsel connected with the action, nor am I

15    financially interested in the action.

16         Witness my hand and official seal this 15th day of

17    November, 2015.

18

19

20

21

22    _____
      VICTORIA AIELLO MILLER, COURT REPORTER
23    NOTARY PUBLIC, STATE OF FLORIDA
      Commission No:  FF199154 DD
24    Commission Exp: March 10, 2018

25



877.291.3376
www.UCRinc.com

**$**

**$100** 76:16 77:1

**$110** 47:20

**$145** 44:16

**$185** 59:19,23

**$200** 76:22

**$250** 45:11

**$3,545** 40:25 41:9,13

**$300** 44:16 51:4

**$350** 46:12

**$370** 46:18

**$420** 46:19

**$440** 47:15

**$45** 47:18

**$485** 40:12 43:25 44:2,5 48:24 49:11,15 51:14,18 55:20

**$50** 51:14

**$500** 49:6,8,9,17,19,21 50:15 51:2,6 52:11 57:11

**$550** 51:19

**$600** 51:24 53:3

**$785** 58:20,25 59:9

**$970** 44:5

**0**

**01-29-13** 50:16

**02-07-13** 49:6

**02-16-15** 4:13 57:7

**02-24-15** 4:12 56:10

**03-11-13** 49:8

**05-08-13** 49:11

**06-06-66** 8:14

**09-06-10** 4:15 57:25 59:18

**09-27-12** 46:16

**1**

**1** 42:25 43:7,23 49:17 54:23

**1:40** 1:17

**10** 80:16 81:24

**10/09/15** 4:8

**10/16/15** 4:7

**10-09-15** 20:6 53:21

**10-13** 49:8

**10-16-15** 19:17 53:19

**102087** 58:11

**11** 13:17 48:23 51:4 63:7 70:12

**11-12-13** 49:21 50:17

**11th** 40:3

**12** 49:15 50:14 51:22 63:13

**12-06-13** 50:20

**12th** 40:1

**13** 16:18

**15** 4:3 51:19

**15th** 81:16

**16** 4:4 19:21 23:8 57:11,16

**16th** 20:2

**17018177286** 4:11 55:19

**173** 18:17

**17479** 50:25

**18** 4:5 46:10

**19** 4:6,7 47:12

**1984** 9:16

**1st** 43:8

**2**

**2:00** 25:4

**20** 4:8,9,10 8:12

**2000** 63:5

**2003** 15:21

**2010** 43:6,7,9,23 44:3,22 58:10,18

**2011** 45:21,22 63:13 64:18

**2012** 45:10,17 46:3,9,10,19 47:4,12 63:7

**2013** 48:23 49:13,15,17,19,23 50:14

**2014** 40:20 42:18,22,25 51:2,4,6,13,18,19

**2015** 1:16 16:18 19:21 40:20 41:12 42:19 51:22 52:11,23 53:2,5 54:23 56:8,18 57:11,16 80:9 81:17

**2015-10110-CC-23 (04** 1:2

**2018** 80:16 81:24

**2064** 50:10

**21** 1:16

**21st** 80:8

**24** 23:3 52:11 53:5 56:8,18 75:21

**24th** 52:21

**27** 41:12

**3**

**3** 51:2

**3:30** 79:15

**30** 70:21

**3000** 1:18 2:4

**305.438.2552** 2:5

**305.670.0987** 2:11

**305579** 52:5

**305-759-1283** 9:5

**31** 40:20

**33137** 2:5

**33138** 8:19

**33156** 2:10

**4**

**4** 46:19 47:4

**4:00** 1:17

**5**

**5** 3:4

**500** 1:18 2:4

**508** 2:10

**5135** 57:12

**5-16-14** 55:23

**55** 4:11

**56** 4:12

**57** 4:13

**58** 4:15

**6**

**6** 45:10,17 46:3,9 49:13,23 53:2 58:10

**60** 36:8,9,24 37:4

**7**

**7** 44:3

**70** 4:16 36:8,9,24



37:4

**72** 4:17

**7553** 46:20

**7th** 58:24

---

8

**8** 51:6

**8440** 46:13

**8500** 8:18

---

9

**9** 49:19 51:18

**9200** 2:9

**9797** 58:25

**9th** 20:3

---

A

**A154** 8:18

**A-154** 63:1,2

**ability** 6:17,21

**accept** 28:24
29:6,14 30:4
54:7,10,17 55:2

**accepted** 28:25
29:4,9 51:19

**accepting** 53:23
54:3,14,23

**access** 32:22

**according** 41:13
49:2

**account** 20:23
42:23 43:3 44:2,4
52:15,16,24,25
57:3 60:12

**accounting** 21:10
31:10 32:7,21
48:2,4,5,7

**accurate** 10:18 39:1
48:7,8

**Acquisition** 21:21

**action** 4:17 72:6,11
81:14,15

**activities** 31:7

**actually** 16:13 20:2
21:8 34:9 41:24
44:18 50:15 65:23
75:14 76:15 77:4

**add** 79:1

**added** 56:4

**address** 8:17

**Addys** 1:15 3:2 5:6
7:19 55:23 80:6

**A-D-D-Y-S** 7:19

**adominguez@kwp
ropertymanagem
ent.com** 9:1

**advice** 73:19,23,24
74:2,5,12,13

**advise** 73:18

**affirmed** 5:7

**afraid** 68:1

**afternoon** 5:11,12

**against** 50:13 69:1

**ago** 8:11,12 9:22
12:11,12 22:10
28:22 31:5 45:20
77:10

**agreements** 32:2,3

**ahead** 19:2

**Aiello** 1:24 5:1
80:5,15 81:5,22

**allowed** 28:16

**alone** 68:21

**already** 5:20 29:21
54:8

**altercations** 77:21

**am** 8:3 81:11,13,14

**American** 7:24

**amount** 4:6
19:4,11,14 38:23
39:2 40:11 43:25
46:25 54:9,16
55:1 74:1

**amounts** 60:18

**Anil** 22:4,7 23:1

**A-N-I-L** 22:9

**answer**
6:5,17,23,25
7:2,3,9 54:1

**answering** 6:5 28:1

**anybody** 29:8 34:3

**anymore** 9:8 22:17

**anyone** 26:24 27:2

**anything** 6:8,21 7:4
12:17 13:4,22
14:2,7 20:21
24:21 26:9,10
27:2,24 32:21,22
36:14 63:18,23
65:21 67:17 75:23
78:3,4,7,16

**anyway** 5:21 74:2

**anywhere** 20:21
64:4

**apart** 64:24

**APPEARANCES**
2:1

**appeared** 80:7

**applicable** 42:1

**application**
66:18,20

**applies** 59:9

**April** 16:18 41:12
51:6 53:2,6

**arrested** 12:7

**Aside** 76:2

**assistant** 10:1,14
17:5 23:20,22
31:20 32:17 33:1
38:4

**assume** 50:24

**assuming** 50:23

**attached** 69:25
72:14

**attention** 70:11

**attorney** 5:24 6:24
7:1,5,6 13:21
81:12,14

**August** 43:9,10
44:3,20 45:10,17
46:3,9 58:16

**authority** 80:6

**authorized** 81:7

**aware** 73:7

**away** 7:25 8:4
65:19

---

B

**background** 9:9

**bad** 74:15,21 76:5

**balance** 41:9,13
44:2,5 46:22
47:2,5,8,17,20
48:17 53:5,10
59:19,23

**balances** 33:12 49:1

**base** 40:12

**based** 40:15

**basic** 69:14

**basis** 27:20

**became** 61:3

**become** 8:2

**beginning** 68:12,17

**behalf** 1:16 2:2,7
17:7



**UNIVERSAL
COURT REPORTING**

877.291.3376
www.UCRinc.com

**believe** 7:16 25:10 32:1 56:18

**belong** 42:15

**belongs** 51:17

**besides** 29:9

**better** 72:18,22

**birth** 8:13

**Biscayne** 1:18 2:4 4:13 8:18 21:9,20 23:1 29:11 33:6 38:2 57:8,11,18 61:23 68:8

**bit** 38:21 60:19

**blank** 53:11

**book** 30:15,16,21 45:1

**books** 46:6

**bottom** 45:5 59:17

**bought** 68:20

**Boulevard** 1:18 2:4,9 8:18

**break** 6:9 53:15,16

**break-in** 67:23

**break-ins** 64:21 65:5

**breaks** 6:12

**bring** 15:7 17:12 18:22 36:12 38:5 48:11 67:25 78:3

**Brochures** 4:17 72:6

**broke** 62:8 63:15 66:25

**broken** 25:6 27:25 63:3

**brought** 13:24 15:8,16 17:14 18:23 41:24 42:7,10 44:24

45:24 46:2 51:5,25 78:4

**BROWARD** 80:3 81:3

**brown** 52:14 76:18

**bulls** 77:10,13

**bunch** 67:4

**business** 8:17,25 9:2 11:16

**businesses** 11:17,18

**buy** 30:16

---

**C**

**C-310** 74:11

**cabinet** 67:12

**calculate** 48:17

**calculations** 40:14

**CAM** 10:3,5,6,7,9,15

**capture** 6:7

**care** 24:13

**Carlos** 13:15

**case** 1:2 38:22 39:24 74:24,25

**cash** 28:16,24,25 29:4,6

**Catalina** 17:1 26:15

**cause** 5:3

**cell** 9:6

**CERTIFICATE** 80:1 81:1

**certified** 39:22 40:6

**certify** 80:6 81:7,11

**chance** 68:25 69:6

**change** 4:9 8:2 20:10,14 22:18 70:15 79:1

**charge** 43:8 44:4

**Charged** 44:2

**charges** 41:16 44:19,20

**check** 23:25 42:5,9 52:3,16 56:23 60:9

**checks** 14:9 68:15

**circle** 52:16

**circled** 41:25 42:12 45:1 52:18 60:10

**citizen** 7:24 8:2

**claiming** 73:8

**claims** 60:16

**clarify** 35:15 36:19 68:6 78:8

**clean** 25:8

**clear** 7:9 26:6 32:25 35:11 70:13

**close** 74:2

**closing** 4:9 20:10,14 71:20

**collect** 24:14,16

**collecting** 25:5 33:7

**collects** 28:9

**comes** 7:25 28:11 54:15 71:8

**coming** 28:3 61:2 75:4

**commercial** 10:25 11:9,12,16,22 35:4

**Commission** 80:16 81:23,24

**Community** 4:17 72:6,10

**company** 22:5

**Complaint** 68:25

69:7 70:1

**complete** 81:10

**composite** 16:13 20:11 44:24 45:10

**computer** 14:4,5,10,11 27:25 33:19,25 34:13 46:24 47:24,25 48:15 53:8

**computerized** 11:21

**concluded** 79:15

**condo** 10:7,8 25:19

**confirm** 34:7,8

**connected** 81:14

**consider** 71:10

**constantly** 25:5

**contact** 22:14 32:5

**continue** 28:24

**continued** 33:25

**continuing** 9:17

**contract** 25:14,17,22 26:3

**contracted** 21:24 33:5

**contractor** 27:8,9,10 29:22,23 30:2

**contractors** 27:2

**contracts** 8:22 26:10

**Contractually** 25:24

**conversation** 5:23 72:21 75:6,10

**copies** 20:12 41:19,21 42:10 45:24 64:4



**UNIVERSAL COURT REPORTING**

copy 18:24 19:8
20:10 39:1
44:24,25 55:13,14
56:17,18 57:10,18
69:25

corner 62:13,24

correct 10:10
11:3,10 13:7,10
16:7,17,19,20
17:3,6,22
18:1,11,18
19:5,21 21:13,19
23:3 24:24
25:8,17,24
26:12,19 27:14
28:13 36:21 37:11
38:3
40:1,2,4,7,12,20,2
1,23 41:2,14
42:11,23 43:3,11
44:7,10,19,20,25
45:3,13 46:4,22
48:21
49:9,14,20,25
51:23,25 52:25
53:4 54:20 55:24
56:15,17,22,25
57:3,14 58:9
59:17 60:22
62:12,18,22 67:21
70:22

correctly 79:11

counsel 2:1
81:12,14

count 67:11

COUNTY 1:1 80:3
81:3

couple 9:21 11:5
43:5 68:6

course 6:3 35:14
38:7 56:6 68:1,20
71:3

courses 9:24 10:14

court 1:1,24 5:2,23
6:6 7:15 54:11
55:3 69:7 80:15
81:5,22

courts 13:11

credit 50:4,12,21
52:12,17,22 60:12

credited 42:23 43:2
50:15 52:12,14,23
56:2,14 57:1,21
60:3

crunch 48:6

Cruz 17:1

Cuba 9:11

Cuban 8:10

current 36:12

cut 36:11

———————
D
Dadeland 2:9,10

daily 23:4

date 8:13 46:16
50:3 53:20

dated 4:12,13,15
16:18 40:3 54:22
56:10 57:7,25
58:10 77:15

dates 19:25

day 27:21 33:7
50:22 59:6 64:22
65:3 80:8 81:16

days 24:7 54:25
70:21

day-to-day 27:20
31:7

DD 80:16 81:23

deal 7:3 20:22

December 49:23
63:6

decide 25:14 37:12

decided 37:19

decision 38:1,17,18

deduct 75:16

default 40:10

Defendant 1:9,16
2:7

Defendant's
15:11,12 16:14
18:4 19:10,17
20:6,14,15 55:15
56:10 57:7,25
70:5 72:6

Delight 1:5 8:20,22
15:19 25:9,16,23
27:16 28:8 29:10
34:23 35:10,16
36:20,22 38:13
43:2 60:16 61:23
68:20 69:1 75:24

delinquency
33:13,14,16
34:5,8,16,19
35:20 36:9,25
37:24 38:6 39:21

delinquent 34:9
35:23 37:5

deliver 70:19

delivering 17:23

demand 4:6
19:3,10,13 38:23
39:1

Department 72:11

depends 27:22

deposition 1:15 4:3
5:1,14,22
13:20,23
15:3,12,18 75:20
79:15 81:9

describe 71:4

DESCRIPTION

4:2

detail 69:12

details 11:25

determines 70:17

difference 25:1,3
75:17

different 16:5
23:12,14,25 27:23
50:3,8,11 63:10
72:12,13,15

digits 57:12

DIRECT 3:3 5:9

directly 34:10

director 17:1

discuss 75:5

discussed 7:5
56:7,14 60:3
75:18

distinguish 19:23

divorce 13:12

divorced 12:22
13:9,16

document 15:22

documents
15:5,16,21 20:18

Dogs 69:22

dollar 60:18

D-O-M-I-N-G-U-E
7:19

Dominguez 1:15
3:2 5:6,11 7:19
13:15 20:9,12
80:6

done 9:17 14:7,8
25:8 63:11 67:19
77:25

double-charged
43:13



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

drawer 64:10 66:10

drawers 66:7 67:16

draws 67:14

drive 27:23

dropped 12:15

Duces 4:3
15:3,13,18

due 46:22 47:8
48:18 53:6,10

DUI 12:10

duly 5:7 80:7

during 43:6,19
64:21

——— E ———

earlier 17:16 18:9
38:24

easier 39:7

easy 8:15

education 9:17

educational 9:9

eight 23:8 25:3

either 48:9 54:23
56:15 57:13 63:13

El 8:18

electronically 14:7
20:22

else 12:17 13:22
14:2 18:22 20:21
22:2 24:18,21
27:2 29:8 73:25
78:3,7,12,16

elsewhere 71:23
72:1,18

e-mail 8:25

e-mails 28:1

employed 29:19

employee 81:12,13

employees 27:1

employer 10:14

Enrique 24:24
27:15 39:15 78:21

enter 46:13 68:16

entered 14:10
50:16,17 51:10
58:25 59:6

entire 21:18 29:12
57:18 69:6

entitled 75:16

entrances 62:20

entries 42:12 45:2
68:11

entry 18:16 41:12
43:9 44:3

envelope 16:19

errata 79:1

errors 48:2

ESQUIRE 2:3,8
3:4

established 70:16

Everybody 69:19

everyday 27:23
28:6

everything 5:24,25
24:13 25:8 73:10
79:5,8

EVIAN 2:3 3:4

evict 38:11 70:14

evicted 70:18,21

eviction 37:19
38:15 69:1 75:1

evictions 34:22
35:17 37:13,23

ewhite@legalservic
esmiami.org 2:6

exactly 26:4

EXAMINATION
3:3 5:9

examined 5:7

example 32:24 64:9

Excel 14:23

Exhibit 4:2
15:11,16,17
16:11,13 18:3,8
19:13,20
20:5,9,11 38:24
39:25 40:19
41:7,9,11
42:3,9,21 44:25
55:14,19 56:9
57:6,23 69:24
70:1 72:5

EXHIBITS 4:1

Exp 80:16 81:24

expert 43:21

explain 78:21

extensions
76:9,18,23

——— F ———

fact 65:17

fair 13:3 54:21

familiar 69:9

fancy 7:4

Farm 4:16 16:22
21:15,24
24:5,8,11,21
25:25 26:11 28:8
31:4 33:8 35:8,21
61:11 70:2,5,13
71:17

February 25:10
51:2 52:11,20
53:5 56:8,18
57:11,16

federal 70:15

feel 43:21

FF100154 80:16

FF199154 81:23

figure 40:16

file 20:18 38:15
51:9 61:25 64:8,9
66:18

filed 37:24 69:1,7

files 13:25 14:4
31:23,24 33:9
62:1
64:1,2,4,11,14
65:11 67:4,5,8,10

filing 67:12

fill 17:11

filled 39:22

financially 81:15

finding 25:5

fine 6:13 13:2 32:23
39:8 46:1 71:1

first 5:7,13,19
15:18,22 21:24
36:24 40:8 63:3
67:3

five 43:1 67:14,15

five-day 18:23
36:13,15 37:7
38:19,20,22
39:4,9
40:3,8,15,24 41:8
42:17
54:8,13,16,22,24
55:5 69:4

fixed 25:7

flipping 15:17

Florida 1:1,19,25
2:5,10 5:3 8:19
10:11 80:2,15
81:2,6,23

flower 11:21



folks 10:15

follow-up 26:16

foregoing 81:8

forgot 7:14

Forty 36:7

forward 46:3

FP&L 76:15 77:2

friendly 71:9 74:2

friends 61:3
71:8,10

front 31:15 53:8
72:10

full 6:6 7:18 54:9
55:1 67:16

full-time 25:23

future 74:2

_____

G

garbage 69:20

general 5:19

getting 32:7

given 18:23 30:11
71:25 73:23

gives 10:14

giving 46:24 69:24
72:3,9 76:5 77:1

gone 41:15

gonna 49:3 60:10

goodness 63:21

gosh 62:3

graduate 9:15

graffiti 27:24

great 69:12

GREATER 1:18
2:3

grounds 70:20

group 21:21

63:17,19

guess 14:20 31:4
36:23

guy 25:6 30:3,23

guys 29:13,16 30:4
33:5,7 53:15

_____

H

hair 76:9,22

half 36:23

hand 16:6 80:8
81:16

hand-deliver 17:17
32:18

handed 55:18 58:3

handing 55:13
57:23

handouts 72:13

handwriting 55:22

happen 26:2 64:21
68:1

happened 7:23
17:10 22:20 25:11
31:13 50:2 62:7
63:15 68:4 76:11

happens 73:11

haven't 71:1,2 78:4

having 5:7,22 74:25
75:5,9

head 6:7 69:15

hear 52:9 73:10

heard 5:20 73:10
77:18

heart 9:3

Hector 52:14

help 75:8 76:17
77:1,3

hereby 81:6

here's 55:14

hers 42:1 60:11

hey 38:5

hiding 13:4

high 9:10,13,14
37:24

highlighted 18:15

hired 21:16 22:2
29:21 30:1

hlkuker@kwglaw
2:11

home 4:16 11:15
15:20 16:22 26:11
28:8 40:11 61:11
62:11 68:9
70:3,6,18,20,22
71:17

hours 23:3,8 25:3
75:21

housing 72:1,15

Howard 2:8,9
39:14

Human 72:11

hundred 76:14

hurry 71:23

husband's 13:14

_____

I

idea 31:9 34:3
37:22 43:16 77:18

Identification
15:13 16:15 18:6
19:11,18 20:7,16
55:16 56:11 57:8
58:1 70:7 72:7

identify 66:22

I'll 57:6 64:8

I'm 5:20 7:8
15:10,16 16:17
19:7,13 26:21

32:23 42:1,15
43:18,22
44:8,9,25 45:10
50:22 52:7
53:13,20 55:13
56:17 57:23
60:10,11 62:20
68:24 69:24 72:5
73:12,22 79:12,14

INC 1:18 2:3

incident 67:20

included 41:23

incorrect 47:6,8

INDEX 3:1 4:1

individual 10:9
63:17

individually 56:9

information
17:12,15 22:14
32:5 66:13,15,19
67:24 68:7 76:6

inhibit 6:17,21

initial 45:4

inside 16:19 31:25
32:1 62:1

interacted 24:4

interaction 74:15
76:8

interactions 74:21
77:23

interested 81:15

intersect 62:21

involved 12:1,4
13:6 34:22

issue 25:6 47:25

issues 48:20 60:13
66:22

it's 5:21 12:19
14:10,18,19,21
34:19 46:24 50:16



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

52:10 54:2
57:18,22 58:6
61:7 62:11,13
65:19 72:9,10
75:9

_____
J

**January** 48:23
51:22

**job** 9:20 25:1,2,11
31:20

**Jordan** 24:23,24
27:15 39:15

**Juan** 13:15

**July** 49:15 51:18
55:9

**jump** 7:6

**June** 49:13 51:13
55:9

**Juniel** 29:17,21

_____
K

**knew** 35:14

**known** 34:17

**Kuker** 2:8,9
12:19,22,25 19:23
20:4 55:14 78:20
79:6,9,13

**KW** 8:21,22 9:21
10:20 11:1 14:18
17:1,7
21:2,7,8,11,18,25
22:10,21,25
25:15,22 26:6
27:16 29:21 33:5
66:20 67:17

_____
L

**lacking** 45:25

**Lakes** 25:19

**Land** 4:9 20:10,15

**Large** 5:3

**last** 29:18 46:13
57:12 70:4

**later** 33:11

**LAW** 2:9

**lawn** 27:7

**lease** 61:22

**leash** 69:23

**least** 53:20 70:21

**leave** 22:10 25:4

**leaves** 59:23

**ledger** 21:3 46:10
47:20 53:19
56:2,5,14,20
57:13,21 58:22

**ledgers** 32:15 43:22

**Legal** 1:18 2:3 76:5

**less** 11:6 34:25
48:19 54:18 62:16
64:25 69:11

**let's** 7:17 15:15
16:2,10 19:2
53:17

**letter** 4:4,5
16:12,14,18,21
17:4 18:5

**letters** 17:8,9

**license** 10:3,5,6,9

**line** 43:11

**Lisette** 22:4,6,20
23:1,22
24:7,10,14,18
29:6,9,24 30:1
33:2 37:17 38:8
68:8,11,17

**Lisette's** 25:2

**list** 4:5 17:20
18:4,9,12,16
39:21 50:13,20

52:2 71:25

**listed** 44:20

**listening** 78:21

**lists** 17:4

**litigation** 12:2,5
13:1,7

**little** 4:16 5:21
16:22 21:8,15,24
24:5,7,10,21
25:25 26:11 28:8
31:4 32:25 33:8
35:8,21 38:21
39:7 60:19 61:11
70:2,5,13 71:17

**lived** 61:10

**lives** 61:4

**living** 61:20 77:12

**LLC** 1:5

**loan** 23:12

**local** 70:15

**long** 8:11 10:20
11:4 12:11 13:16
21:14 22:10 28:20
61:10,17 77:5

**longer** 22:5

**lot** 4:6 19:4,10,14
35:25 38:23 39:2
40:10,11 47:24,25
48:2 63:2 67:8
73:7

**lying** 76:6

_____
M

**mail** 39:22,23 40:6

**mailboxes** 62:23

**maintenance** 25:6
29:13,16
30:3,4,23

**mall** 11:23

**man** 77:12

**managed** 11:9 31:6

**management**
8:21,23 10:21
11:1,14 14:19
17:2,8 21:2,12
26:7 33:6,24,25
62:10 67:17

**manager** 10:1,15
17:5 21:9 22:4
23:2,19,20,21,23
25:15 31:21 32:19
33:2 37:16 38:4,5
39:16

**managers** 23:13

**managing** 36:23
45:14 61:5

**marathon** 6:11

**March** 51:4 80:16
81:24

**Maria** 7:22

**mark** 15:10 16:2,11
18:2 19:2,3 20:5,8
42:5,9 55:14 56:8

**marked** 15:13
16:14 18:5
19:11,18 20:7,16
38:23 55:15,18
56:11 57:6,8 58:1
70:6 72:7

**marking** 19:13
20:11 57:23 69:24
70:1 72:5

**married** 12:20,21
13:7

**match** 49:1,3

**matter** 65:17

**may** 6:24 7:1
40:1,3,20 42:18
54:21,22 55:9
60:2,8 70:14



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

**maybe** 9:22 23:6,8 32:24 66:1 74:9 75:7

**mean** 10:2 21:23 26:25 31:17 34:10 38:9 42:6 48:5 50:1 56:16 61:13,25 66:9 67:15 69:3 71:8 72:20 73:21

**meaning** 34:6

**meant** 7:12 35:15

**medication** 6:16,20

**meeting** 75:5,13

**memory** 78:13

**mention** 78:7

**mentioned** 33:21 35:20

**mess** 65:6

**met** 27:17

**Miami** 1:18,19 2:3,5,10 9:14 13:18 25:19

**MIAMI-DADE** 1:1

**middle** 7:21 62:20

**Miller** 1:24 5:1 80:5,15 81:5,22

**Mines** 66:14

**minute** 53:13

**misinterpreted** 73:17

**misleading** 12:20 13:1

**mobile** 4:16 11:15 15:20 16:22 26:11 28:8 40:11 61:11 62:11 68:9 70:3,6,18,20,21 71:17

**money** 4:11,13 14:9

28:13,18,19 29:14 30:6 36:16 38:10,19 45:4,5 46:14 50:3,5,7,11,21,23 51:5,25 52:19 53:2,9 54:17 55:4,19,20 57:7,10,12,16,18 58:11,12 59:15 65:13,17,18,21,23 66:2,3 73:25 74:1 75:15 77:5

**month** 32:1 52:22 63:6,8,12 64:22

**months** 40:16,22 50:8,9,11

**mouth** 7:13

**move** 71:23 72:1,18,23

**moved** 15:20

**multiple** 26:20

**myself** 15:24 29:3

———————

### N

**naturalize** 8:11

**negative** 77:23

**negotiate** 75:14

**negotiations** 26:10

**Nelly** 1:8 18:12 57:17

**Nexus** 14:12

**nice** 61:9

**night** 65:1

**nine** 40:22

**Niu** 14:12 33:21,22

**N-I-U** 14:12,13

**nobody** 9:7 36:17,18 72:25 75:8

**nod** 6:7

**non-CAM** 10:1,15

**nonpayment** 35:19 70:14

**nor** 81:12,14

**normal** 6:25

**North** 2:10

**Notary** 1:25 5:2 80:15 81:6,23

**notation** 49:24 58:14

**note** 52:11

**notes** 81:10

**nothing** 20:25 31:14 32:16 62:8 67:19 78:10,12

**notice** 4:3,9 15:2,12,17 18:23 20:10,14 38:22 39:4,9 40:3,8,15,18,24 41:8 42:17 54:8,13,16,22,24 55:5 69:4 70:19

**notices** 15:19 36:14,15 37:7 38:19,20 39:18

**notified** 40:9

**notify** 67:22

**November** 43:18 47:12 50:14 81:17

———————

### O

**oath** 5:25 6:2 80:1

**object** 6:24 7:1,7

**obviously** 43:8

**October** 1:16 19:21 20:1,2 46:19 47:4 49:19 80:9

**office** 11:21 22:2

23:6 27:25 31:16 33:8,9 41:20 46:5 62:10,23 64:10,12 65:24 68:16 79:4

**OFFICES** 2:9

**offices.com** 2:11

**official** 80:8 81:16

**Oh** 10:8 12:23 14:13 23:22 36:2 50:16 52:8,14 59:1 61:10 62:3 63:10,11,13 65:23 66:11,20 67:8 72:13

**okay** 6:13,14,25 7:10,11,12,15 8:1 11:8 12:17,23 15:9 16:1,9 17:20 18:16,20 19:1 23:22 24:13 31:18 34:20,21 35:5 39:6,8 40:18 43:20 45:4 46:16,18 50:6,24 51:11,18 52:1,20 54:2,12,18 56:16,21 57:1,20 58:7 59:1,3,5,8,17,24,2 5 71:1 74:5 78:18 79:12,14

**old** 20:4 33:25

**Olympics** 6:12

**ones** 21:24 41:25 52:17 60:3,10

**opinion** 43:22

**option** 8:1

**order** 4:11,13 28:13,18 50:3,5,7,11,21 53:9 54:10 55:19,20 57:7,10,12,16,19



58:11 65:18

**ordered** 78:24

**orders** 14:10 28:19
29:14 30:6 45:4,5
46:15 51:5,25
53:2 59:15
65:13,18,22,24
66:2,3

**ordinances** 70:15

**original** 18:25
19:5,15 51:8
64:11

**originals** 64:6

**others** 60:8

**otherwise** 26:22

**outcome** 12:13

**outside** 71:11

**oversee** 26:20

**owe** 52:18

**owed** 33:12 73:25
75:17

**owes** 34:3 38:19
40:15,17,25 60:17
75:15

**owned** 10:24 11:1
23:1 68:9

**owner** 21:20,23
38:1
70:18,19,20,22

**owners** 26:11 31:22
38:10

**ownership** 75:24

———————
P
———————

**p.m** 1:17 79:15

**package**
15:22,24,25
16:3,5,8,10,18
17:19,21,23 26:18

**packages** 18:10

76:1

**page** 3:2 4:2 15:17
18:14 39:25 40:8
41:12 70:4 72:10

**paid** 26:6 36:17
37:10 45:12 58:12

**painful** 5:18

**paper** 14:8

**papers** 32:1 62:1

**paragraph** 70:12

**park** 4:14,16 11:15
15:20 17:5,9
20:10,14 21:9,20
22:25 23:1 25:9
26:11 27:3,22
28:5,6,8,23 31:7
33:6,24 37:5 38:2
39:16 45:14
57:8,11,18
61:4,11,23
62:11,14 68:9
69:10,21
70:3,6,16,17
71:17,20 72:17,25
74:1,6 75:24
77:10

**parking** 69:21

**partial** 54:14 55:2

**particular** 21:17

**particularly** 11:20

**parties** 81:12,13

**part-time** 25:4

**pass** 38:18

**passed** 75:25

**pay** 28:3,12,16
30:15 37:7 40:19
42:18 50:11
54:6,9,11,15,25
55:4 61:3
69:17,20 71:14,17
73:1,9 75:17

76:15,16 77:1,5

**payable** 28:14
57:10,17 65:19

**payment** 4:6 18:25
19:4,10,14 38:23
39:2 40:10,11
42:14 43:10,11
44:4,20 46:9
48:23 49:6,8
50:4,14,22
51:18,19,24 54:10
59:7,23

**payments** 14:1,10
29:9 30:5 32:18
41:16 42:21 43:1
44:14,15 51:13
53:25
54:3,5,9,11,14
55:2,3 58:24 60:2

**people** 6:23 23:14
29:4 30:15,19
32:5 35:23 36:12
37:10 38:11 45:5
63:17,19 73:14,20
74:10

**percent** 36:8,9,24
37:4

**perfume** 10:24
11:2,8

**person** 28:14 74:9

**personal** 12:24

**personally** 60:22
80:6

**phase** 21:17

**phone** 9:4 22:16

**pick** 68:15

**picked** 69:21

**pipe** 25:6

**pit** 77:10,13

**Plaintiff** 1:6 2:2

**please** 6:5,10,13

7:18 19:9

**plenty** 67:7

**plumber** 27:7

**point** 18:14 33:11
70:11 71:6,13

**pointing** 41:11

**police** 65:7 67:18
77:9

**Portal** 8:19

**position** 23:18

**possible** 60:1,7 66:3
74:8

**post** 39:22

**posted** 39:25

**prefer** 19:7

**premises** 70:22

**prepare** 13:20,22
16:24 39:9 48:6

**prepared** 17:2
39:11,13

**present** 15:21 42:22

**pretty** 70:12

**previous** 31:22

**previously** 56:7,13

**printed** 33:17 34:13

**prior** 21:20,23
28:23 38:1,10
47:1 70:21

**privilege** 7:3

**probably** 23:9
59:9,15 65:13,25
66:14 67:16 73:25
75:20

**problems** 47:25

**processing** 14:21

**program**
14:11,15,17,18,19
,21 21:2,4 33:20



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

programs 14:5

properties 10:6
23:10,16 25:12,18
26:20

property 8:21,22
10:20,25
11:1,9,11,12,16,2
2 17:2,7 21:2,11
23:13,18 24:3,19
25:7,13,15 26:6
27:4,13 31:21
33:2,6 35:4 38:4
67:17

prospectus 4:16
70:2,5

provided 20:9,12

Public 1:25 5:2
80:15 81:6,23

pull 30:22 33:9
48:14

purple 42:9

purposes 60:8

_____ Q _____

question 7:1,7,8
12:19 26:14 30:24
54:1,2 61:7
79:9,10

questionable 78:5

questionnaire
16:19 17:13

questions 6:4,15,24
7:3,10,18 43:5
78:6,19,20

_____ R _____

reading 44:8 78:22

really 9:7 10:12
76:17 77:3

reason 72:19

recall 76:8 77:9

receipt 4:10,12,15
17:21 28:15
30:11,17,18,20,21
,25 31:1 40:5 42:7
45:7,11,18
46:19,20,21,24
47:4,7,12,17
48:21 50:17
51:15,16
52:4,11,18 53:5,9
55:15 56:7,10,19
57:25 58:8,10,11
59:2,11,16,18

receipts 13:24
14:1,9 20:12,15
28:3 29:15
30:6,8,13,14
31:16
41:19,21,23,25
42:10,13,16
44:23,24
45:1,22,24
46:2,3,5,7 47:1
48:8,13 60:2

receive 14:9 15:2,25
28:13 32:18 36:13
65:18

received 4:5 16:8
17:19 18:5,9 43:2
46:25

receiving 31:16
53:9,25 54:5

recently 74:16

recommend
37:23,25

recommendation
38:14

record 5:21 16:2
52:7 53:17 62:10
81:10

records 14:8 31:21
32:16 33:12 34:3
41:13 53:14 56:19

refer 16:12

referring 17:16,20
18:3,8 40:9 42:3
45:10 48:14 52:4
73:22

refresh 78:12

refused 31:1

regular 39:22 54:8

regulation 70:19

regulations
69:10,19 70:4,12

relationship 71:5

relative 81:11,13

remember 6:21
8:15 11:5 26:4
29:7,18,25 31:25
32:6,7,17 35:1,17
54:7
55:6,7,10,11,12
63:5,7 64:20
65:3,25 68:14
74:7,12 75:6,11
77:11,24 78:14

remembers 75:7

remind 7:15

remove 52:15

rent 4:7,8,10
14:8,19 18:25
19:4,17
20:6,12,15 21:3
25:5 28:9 29:9
30:4 31:11
32:8,15 33:7,12
34:19 35:24
36:12,25 37:5,8
39:21 40:12,19
41:5,7,16 42:18
43:8,9,10,18,21,2
3 44:3,18,20 45:1
46:1,10
47:10,12,20,24
48:7,15 53:19,23

54:3,14 56:14
57:13,21 58:14,22
60:1,9,17 62:23
64:10,11 68:7
69:17,20 70:14
71:14,17,20
73:1,2,8

rental 4:6
19:4,11,14 32:3
38:23 39:2

rents 24:14,16
68:15

repeat 5:20 24:9

rephrase 31:17

reply 75:13

report 4:7,8 19:20
28:4 65:9,11
67:18,20 81:8

Reported 1:24

reporter 1:24
5:2,23 6:6 7:15
80:15 81:1,5,22

represent 42:10

request 67:24

requested 15:5
17:12

requests 28:1

resident 16:22
19:20 31:2 64:2
66:13

residents 4:5
17:8,15 18:4,9
28:16 30:5 37:7
67:22 68:3
71:16,19,22,25
72:3,9,17,22 73:7
74:6 76:5,6 77:15

resources 72:1,15

rest 7:9,17

restaurants



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

11:19,20

**restroom** 6:10

**review** 13:25 14:4
68:25

**roads** 62:21

**Robert** 29:17,20

**Roberto** 74:11,13

**roles** 68:7

**roll** 4:7,8 19:17
20:6 32:8
33:13,14,16
34:8,17,19 35:20
39:21 41:5,7,16
47:10,24 48:7,15
60:9

**room** 60:24

**rule** 70:18

**rules** 5:19
69:9,14,19
70:3,12,16,17

**rumors** 77:17

**run** 10:6
30:12,13,14

**running** 25:7

_____

S

**sales** 11:21

**save** 71:19 73:1,2,8

**saved** 9:4

**saw** 51:9 53:1 65:6

**scattered** 66:1,7

**school** 9:10,13,14

**scratch** 32:12,13

**seal** 80:8 81:16

**second** 39:25 41:11
67:4

**seem** 13:4

**seen** 70:9,24,25

**sent** 15:19,22 17:8
37:7 40:5 54:13
55:5

**sentences** 6:6

**September** 40:20
42:18,22,25
43:7,8,23 44:3,19
46:10 49:17 51:19
58:10,16,24

**septic** 25:6

**served** 54:8

**service** 27:7

**Services** 1:18 2:3
72:11 76:5

**sets** 76:9

**setting** 75:9

**settlement** 75:14

**seven** 42:21 43:1

**shaking** 6:7

**sheet** 79:2

**sheets** 28:2

**She's** 22:4 61:9

**Shirley** 1:8 15:20
18:12 20:19
40:9,15,19,24
42:17 43:2
45:2,11 53:24
54:4,13 57:2,17
58:12 60:17,20,22
61:1,4,10,20,22
64:9 69:2 71:5,13
73:21,22,23
74:16,23
75:3,19,23
76:4,8,22
77:6,9,20

**Shirley's** 20:22
39:24 40:12 52:23
64:9

**short** 60:13

**showed** 34:2,8

**showing** 54:16

**shows** 39:25 40:5
41:9,13 43:7,9,18
46:9,12,18
47:4,20 49:21
53:5 57:13

**Shriley** 55:4

**sign** 16:8 17:18
25:14,16,17 45:9
75:23

**signature** 18:19
55:23,24,25 75:25

**signatures** 15:25

**signed** 7:24 17:15
25:22 26:3,17
27:16 57:17

**sit** 32:18

**site** 23:2 62:11

**sites** 24:1

**sitting** 48:5

**six** 43:1 46:13

**sixes** 8:16

**skimmed** 40:17

**sold** 25:9 76:9,12

**somebody** 28:11
34:7 63:15

**somebody's** 64:8

**someplace** 73:25

**Sometime** 25:10

**sorry** 34:16 43:18
52:8,12 53:21

**South** 2:9

**speaking** 13:21

**specific** 38:21

**specifically** 39:24

**spell** 7:18 22:8

**spend** 38:10

**spoken** 74:23

**spread** 28:2

**Springs** 9:14

**stamping** 19:8

**start** 16:10 21:6
25:4 28:1 31:8
32:13,16 45:25
58:3 68:13

**started** 7:17 21:7
29:20 31:20 34:17
35:21 45:20
61:2,25 68:18
75:6

**starting** 32:12,15
54:21,22,23

**state** 1:25 5:2 10:11
70:15 80:2,15
81:2,6,23

**statement** 18:25
41:5

**statements** 14:1

**states** 40:11 42:17

**stayed** 22:12 68:2

**staying** 25:23

**steal** 63:18 66:2

**stenographic** 81:10

**stenographically**
81:8

**step** 33:7

**stolen** 62:2 65:11
66:4,13,14 67:1

**stop** 6:11 22:20
53:23,25 54:3

**stopped** 54:5,14

**store** 10:24 11:2,8

**stored** 20:21

**stores** 11:21



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

strip 11:23

stub 4:11 55:20

stuff 12:24 31:16

substance 6:16,20

Suite 1:18 2:4

supervise
26:14,24,25
27:1,12

supervises 26:13

supposed 17:11

sure 6:5 17:18 19:7
25:8 26:21 28:14
42:1,15 52:20
53:11 60:5,11
69:11 71:12 73:12

surprise 28:6

sworn 5:7 80:7

system 33:25

_____

T

taking 4:3 6:16,20
15:2,12,18

talk 13:3 60:19
62:5,6 71:9 75:3

talking 29:10
38:20,22 63:10

tall 67:14

tanks 25:7

taxes 48:6

Tecum 4:3
15:3,13,18

telephone 9:2

ten 10:6,7,8 12:12
36:1 54:25

tenant 34:10 70:14

tenants 17:11 28:3
30:23

term 34:16

terms 14:8 48:7

testified 5:8

Thank 18:20 19:16
35:13 57:4 63:21

that's 6:25 7:4,15
8:15 13:2,3,13
14:13,15,25
16:7,20 19:21
20:4 24:24 25:23
26:14 27:16 32:23
33:15 34:17,21
35:25 39:8 42:7
43:20 44:7 45:9
48:17
50:4,12,19,25
53:20 54:2,13
55:24,25 56:25
59:4,10 62:18
69:18 71:1
74:3,9,12 75:17
78:1

theft 66:22

there's 40:5 51:13
55:22 67:19
72:12,13,25

Thereupon 5:5

they're 5:21 60:11
76:6,21

third 15:17 67:4

Thirty 36:5

throughout 24:1

title 23:20

today 6:18
15:3,7,16 20:13
41:21,24 42:10
46:3 52:25 53:1
60:3,7,8,24 74:25
75:5,20 78:4

today's 13:20,23

top 53:20 55:22
69:15

total 21:11 41:9

53:3,12 58:20,23

totals 53:7 59:2

touch 22:12

towards 59:12

Towers 2:10

track 21:3 30:19

traffic 12:14,15,16

trailer 18:18
62:8,13

training 9:20,21,23
10:15

Transaction 19:20

transcribe 79:10
81:8

transcript 78:23
81:9

traveled 23:13

trick 54:2 61:7

true 13:13 39:1
81:9

trusted 34:13

truth 6:1

truthfully 6:17

try 5:18 28:2 55:4

trying 43:22

turn 16:7 27:25

Twenty 36:3

twice 23:6

type 14:17

typed 39:15

_____

U

Uh-huh 10:17 49:7
60:21 69:13

um-hmm 11:18
33:4 61:21 63:14
64:13

undersigned 80:5

understand 6:2
28:7 33:9 42:24

Unite 8:18

units 10:7,8

unnatural 5:22

updated 47:25

upon 70:20

_____

V

vacate 70:22

vendors 24:22
27:12

verbal 77:21

verbally 68:4,5

verified 41:15

verify 34:5,6

Victoria 1:24 5:1
80:5,15 81:5,22

violating 70:18

violation
12:14,15,16
70:14,16

visualize 62:18

vs 1:7

_____

W

wait 30:25 50:16

waive 78:22
79:3,13,14

walk 24:12 28:5
40:14

wasn't 22:22 34:2
37:14 53:7,11
56:19 63:20

watch 28:4

water 6:10

Wealthy 1:5



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

**8**:20,22 15:19
25:9,16,22 27:16
28:8 29:10 34:23
35:10,16 36:20,22
38:13 43:2 60:16
61:23 68:20 69:1
75:24

**Wednesday** 1:16

**week** 23:7,8 24:1
64:23,24 65:3

**weeks** 77:7

**weird** 75:9

**welcome** 4:4,5
16:12,14,17 17:4
18:5,10,21 26:17
33:8 57:5

**we'll** 5:18 11:25
13:2 16:12 64:10

**we're** 5:22 6:12
16:11 18:2 19:8
20:8 35:11 38:21
39:4 48:14
52:4,10 69:24
70:1 75:9

**we've** 38:5 71:8

**whatever** 6:10 28:1
34:13 48:14 75:16

**whether** 38:14

**WHITE** 2:3 3:4
5:10 13:2,5
15:10,14
16:2,4,10,16
18:2,7
19:2,7,12,19
20:1,5,8,17
53:13,17,18 55:17
56:12 57:9 58:2
70:8 72:8 78:18

**whoever** 38:19
63:23

**whole** 37:4 67:12

**whomever** 17:25

**who's** 29:9 33:2,3

**Witness** 3:2
12:21,23
19:6,9,25
79:5,7,12,14 80:8
81:16

**WITNESSES** 3:1

**work** 8:19,20,21
12:1 21:10
23:10,13,16 24:22
25:4,20 26:24
27:4,10,13 28:2
29:13 31:15 36:11
44:22 66:20 71:11

**worked** 10:25 21:15
22:2 35:3,8

**working** 21:7 22:21
28:21 29:20,21
35:6,21 61:13,25
64:15 68:8 74:20

**works** 10:12 28:11

**Wow** 8:12 35:25
69:16

**write** 5:23 6:6 14:9
29:15 30:21
48:12,13 53:7,8
59:16

**writing** 7:6 68:3

**written** 53:10 54:24
61:22 70:19

**wrong** 16:17 44:11
56:18

**wrote** 45:18
50:2,4,7,10 59:16

---
Y
---

**year-and-a-half**
22:11

**yourself** 34:7 71:10

**you've** 13:6 70:24
72:17,25

---
Z
---

**zero** 46:22 47:1,4

